**In re MORTGAGE LENDERS NETWORK USA, INC., Debtor.**

**Mortgage Lenders Network USA, Inc., Plaintiff,**

**v.**

**Wells Fargo Bank, National Association, Defendant.**

**Bankruptcy No. 07–10146 (PJW).**

**Adversary No. 07–51683 (PJW).**

United States Bankruptcy Court, D. Delaware.

June 2, 2009.

Laura Davis Jones, Alan J. Kornfeld, Gillian N. Brown, Timothy P. Cairns, Pachulski Stang Ziehl & Jones LLP, Wilmington, DE, for the Debtor/Plaintiff.

Laurie A. Krepto, Montgomery, McCracken, Walker & Rhoads, LLP, Wilmington, DE, Steven M. Mertz, Charles F. Webber, Faegre & Benson LLP, Minneapolis, MN, for Defendant Wells Fargo Bank, N.A.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

PETER J. WALSH, Bankruptcy Judge.

### INTRODUCTION

These findings of fact and conclusions of law are with respect to the adversary proceeding initiated by Plaintiff Mortgage Lenders Network USA, Inc. ("MLN") against Defendant Wells Fargo Bank, National Association ("Wells Fargo"). MLN claims that Wells Fargo failed to reimburse MLN for servicing advances MLN made with respect to three trusts that were transferred to Wells Fargo as part of MLN's Chapter 11 bankruptcy proceeding. (Adv. Doc. # 1.) In response, Wells Fargo counterclaims that MLN owes Wells Fargo certain expenses incurred by Wells Fargo in connection with the transferred trusts. (Adv. Doc. # 7.) The adversary proceeding was tried before the Court on

January 26 and 27, 2009. For the reasons set forth herein, the Court finds that Wells Fargo must reimburse MLN for all the servicing advances it has failed to pay, and finds that MLN owes Wells Fargo for certain, but not all, of the expenses of which Wells Fargo seeks reimbursement.

The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052. To the extent any of the following findings of fact are determined to be conclusions of law, they are adopted, and shall be construed and deemed, conclusions of law. To the extent any of the following conclusions of law are determined to be findings of fact, they are adopted, and shall be construed and deemed, as findings of fact.

## FINDINGS OF FACT

### Background

1. MLN is a corporation that originated and purchased residential mortgage loans. On February 5, 2007, it petitioned for relief under chapter 11 of title 11 of the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*

2. Prior to filing for bankruptcy, MLN serviced close to 120,000 mortgage loans. In connection with the wind-down of MLN's servicing business, MLN transferred servicing of all 120,000 loans, including the loans at issue here. (Adv. Doc. # 101, 27:6–22.)

3. Prior to filing for bankruptcy, MLN had accumulated pools of 1,000 mortgage loans and sold them to three trusts. The three trusts are: Mortgage Lenders Network Home Equity Loan Trust 1999–1 ("1999–1 Trust"), Mortgage Lenders Network Home Equity Loan Trust 1999–2 ("1999–2 Trust"), and Mortgage Lenders Network Home Equity Loan Trust 2000–1 ("2000–1 Trust"). (*Id.* at 167:2–16.)

4. Wells Fargo is the indenture trustee with respect to the 1999–1 Trust and the 1999–2 Trust, and the trustee of the 2000–1 Trust. (Plaintiff Trial Exhibit ("Pl. Tr. Ex.") G, H, and E, respectively; Adv. Doc. # 101, 167:21–168–10.)

5. In its capacity as indenture trustee or trustee, Wells Fargo represents the interests of investors in the trusts. (Adv. Doc. # 101, 112:10–13.)

6. Wells Fargo treats all three of the trusts as separate from one another and, accordingly, accounts separately for the assets and liabilities of each trust. (*Id.* at 245:12–18.)

7. MBIA Insurance Corporation ("MBIA"), a bond insurer, insured certain of the investments in the 1999–1 Trust under an Insurance Agreement dated June 1, 1999. (Defendant Trial Exhibit ("Def. Tr. Ex.") 21; Adv. Doc. # 101, 194:1–20.) Under the Insurance Agreement, if the trust is not solvent and cannot pay the required principal and interest payments, MBIA makes up the shortfall. (Adv. Doc. # 101, 194:1–20.)

8. The Insurance Agreement also includes the following pertinent provision:

> The Servicer and the Seller agree to pay to the Insurer as follows: any and all charges, fees, costs and expenses that the Insurer may reasonably pay or incur, including, but not limited to, attorneys' and accountants' fees and expenses in connection with ... (ii) the enforcement, defense or preservation of any rights in respect of any of the Transaction Documents, including defending, monitoring or participating in any litigation or proceeding (including any insolvency or bankruptcy proceeding in respect of any Transaction participant or any affiliate thereof) relating to any of the Transaction Documents, any party to any of the Transaction Documents, in

its capacity as such a party, or the Transaction . . . .

(Def. Tr. Ex. 21, p. 24–25, § 3.03(c).) Servicer is defined as the servicer under the applicable servicing agreement; Seller is defined as MLN and its successors; and Insurer is defined as MBIA. (*Id.* at p. 1.) The servicing agreements are discussed below.

9. The Insurance Agreement is governed by the laws of the State of New York. (*Id.* at p. 36, § 6.04.)

10. In connection with its insurance of the investments in the 1999–1 Trust, MBIA executed an Indenture dated June 1, 1999 with the 1999–1 Trust. (Def. Tr. Ex. 24.) In pertinent part, it obligates Wells Fargo, on behalf of the trust, to reimburse MBIA any "amounts due and owing . . . under the [1999–1] Insurance Agreement." (*Id.* at pp. 64–65, § 8.02(c)(I).)

11. The Indenture is governed by the laws of the State of New York. (*Id.* at p. 83, § 11.13.)

12. Similarly, Financial Security Assurance, Inc. ("FSA"), also a bond insurer, insured certain of the investments in the 1999–2 and 2000–1 Trusts under an Insurance and Indemnity Agreement dated as of November 1, 1999 and an Insurance and Indemnity Agreement dated as of April 1, 2000, respectively. (Def. Tr. Ex. 22 and 23, respectively; Adv. Doc. # 101, 194:1–20.) Under those agreements, if the trusts are not solvent and cannot pay the required principal and interest payments, FSA makes up the shortfall. (Adv. Doc. # 101, 194:1–20.)

13. The Insurance and Indemnity Agreement governing the 1999–2 Trust contains the same pertinent provision as the Insurance Agreement governing the 1999–1 Trust. (Def. Tr. Ex. 22, pp. 27–28, § 3.03(b).) The Insurance and Indemnity Agreement governing the 2000–1 Trust contains a functionally equivalent pertinent provision. (Def. Tr. Ex. 23, pp. 16–17, § 3.03(b).)

14. The Insurance and Indemnity Agreements are governed by the laws of the State of New York. (Def. Tr. Ex. 22, p. 41, § 6.05; Def. Tr. Ex. 23, p. 29, § 6.05.)

15. Also similarly, in connection with its insurance of the investments in the 1999–2 Trust, FSA executed an Indenture dated November 1, 1999 with the 1999–2 Trust. (Def. Tr. Ex. 25.) In pertinent part, it obligates Wells Fargo, on behalf of the trust, to reimburse FSA any "amounts owing . . . under the [1999–2] Insurance Agreement." (*Id.* at pp. 64–65, § 8.02(c)(v).)

16. The Indenture is governed by the laws of the State of New York. (*Id.* at p. 83, § 11.13.)

17. Written servicing agreements (collectively, the "Servicing Agreements") govern MLN's and Wells Fargo's rights and obligations as servicer and indenture trustee or trustee, respectively. (Pl. Tr. Ex. E, G, and H.)

18. The servicing agreement governing the 2000–1 Trust ("2000–1 Servicing Agreement") similarly obligates Wells Fargo, on behalf of the trust, to pay FSA any "Reimbursement Amount," which is defined to include amounts owing under the Insurance and Indemnity Agreement governing the 2000–1 Trust. (Pl. Tr. Ex. E, p. 26 and p. 85, § 4.04(b)(iv).)

19. Loan servicing is the process of administering borrowers' payments on their loans. This process includes sending out billing statements, monitoring the loan accounts, collecting loan payments, administering taxes and insurance, handling delinquent loans, and protecting property on behalf of the owner of the loans. (Adv. Doc. # 101, 21:14–21.)

20. The Servicing Agreements generally provided that MLN was to make servicing advances—advances of money MLN made out of pocket in the ordinary course of business as the servicer on behalf of borrowers under the loans—to the trusts or to third parties from time to time to cover various expenses. (Pl. Tr. Ex. E at p. 57, § 3.01(b)(ii), G at p. 34, § 4.01(b), and H at p. 33, § 4.01(b); Adv. Doc. # 101, 25:13–27:1.) MLN would be repaid for the servicing advances from the borrower under the loans, at the time of liquidation of the properties on which the applicable loans were being paid, or through the Trusts. (Adv. Doc. # 101, 25:13–27:1.)

21. There are four categories of servicing advances that MLN made under the Servicing Agreements: escrow advances, corporate advances, "P & I advances," and deferred-interest advances. (*Id.* at 236:9–12.)

22. Corporate advances are amounts that MLN advanced from its own funds to pay a variety of expenses relating to the mortgaged properties that the trusts held, such as collection-attorneys' fees, foreclosure costs, appraisal fees, and property-inspection fees. (*Id.* at 93:2–6.)

23. As to MLN's other obligations, as servicer, the Servicing Agreements include the following pertinent provisions:

a. Section 2.01(a) of the servicing agreements governing the 1999–1 and 1999–2 Trusts ("1999–1 Servicing Agreement" and "1999–2 Servicing Agreement," respectively) provides: "The Servicer, as servicer, shall administer the Mortgage Loans with reasonable care, using the degree of skill and attention that the Servicer exercises with respect to all comparable mortgage loans that it services for itself or others." (Pl. Tr. Ex. G, p. 18 and H, p. 18.) Servicer is defined as "Mortgage Lenders Network USA, Inc. or any successor servicer appointed as provided

pursuant to this Agreement." (Pl. Tr. Ex. G., p. 15, and H, p. 15.)

b. Similarly, § 3.01(b)(I) of the 2000–1 Servicing Agreement provides: "[T]he Servicer shall service and administer the Mortgage Loans with reasonable care, using that degree of skill and attention that the Servicer exercises with respect to all comparable mortgage loans that it services for itself and others. . . ." (Pl. Tr. Ex. E, p. 56.) Servicer is defined as "Mortgage Lenders Network USA, Inc . . . . or its successor in interest, in its capacity as seller of the Mortgage Loans." (*Id.* at Ex. E, p. 28.)

c. Section 6.01 of the 1999–1 Servicing Agreement and 1999–2 Servicing Agreement provides:

All reasonable costs and expenses (including attorney's fees) incurred in connection with transferring the Servicer Mortgage Files to a successor Servicer, amending this Agreement to reflect the appointment of a successor as Servicer pursuant to this Section 6.01 or otherwise in connection with the assumption by a successor Servicer of the duties of the predecessor Servicer hereunder (such expenses, "Transition Expenses") shall be paid in full by the predecessor Servicer upon presentation of reasonable documentation of such costs and expenses. . . .

(Pl. Tr. Ex. G, p. 40 and H, p. 39.)

d. Similarly, § 7.02 of the "2000–1 Servicing Agreement" provides:

All reasonable costs and expenses (including attorney's fees) incurred in connection with transferring the Servicer Mortgage Files to a successor Servicer, amending this Agreement to reflect the appointment of a successor as Servicer pursuant to this Section 7.02 or otherwise in connection with the assumption by a successor Servicer of the duties of

the predecessor Servicer hereunder (such expenses, "Transition Expenses") shall be paid in full by the predecessor Servicer upon presentation of reasonable documentation of such costs and expenses. . . .

(Pl. Tr. Ex. E, p. 108.)

e. Section 6.04(b) of the 1999–1 Servicing Agreement and the 1999–2 Servicing Agreement provides:

> The Servicer shall pay or reimburse the Indenture Trustee, from its own funds, upon its request for all reasonable expenses, disbursements and advances incurred or made by the Indenture Trustee in accordance with any of the provisions of this Agreement, the Indenture and the Management Agreement . . . (including, but not limited to, the reasonable compensation and the expenses and disbursement of its counsel . . .).

(Pl. Tr. Ex. G, pp. 41–42 and H, p. 41.)

f. Similarly, § 8.05 of the 2000–1 Servicing Agreement provides:

> [T]he Seller covenants and agrees to pay or reimburse the Trustee, upon request, for all reasonable expenses, disbursements and advances incurred or made by the Trustee . . . in accordance with any of the provisions of this Agreement (including the reasonable compensation and the expenses and disbursements of its counsel . . .).

(Pl. Tr. Ex. E, p. 114.) Seller is defined as "Mortgage Lenders Network USA, Inc . . . . or its successor in interest, in its capacity as servicer of the Mortgage Loans, which term shall also include any successor servicer appointed hereunder." (*Id.* at p. 28.)

g. Section 6.04(c) of the 1999–1 Servicing Agreement and the 1999–2 Servicing Agreement provides:

> The Servicer agrees to indemnify the Indenture Trustee . . . from, and hold [it] harmless against, any and all losses and liabilities, damages, claims or reasonable expenses (including reasonable attorneys' fees, expenses and disbursements), incurred or in connection with this Agreement, the Indenture, the Notes or the Management Agreement, including, but not limited to, any such loss, liability or expense incurred, arising in respect of or in connection with any legal action against the Trust Estate, the Issuer or the Indenture Trustee . . . or the performance of any of the Indenture Trustee's duties hereunder (except in the event it assumes the duties and obligations of the Servicer hereunder as a result of an Event of Default) other than any loss, liability or expense incurred by reason of the negligence, bad faith or intentional misconduct of the Indenture Trustee.

(Pl. Tr. Ex. G, p. 42 and H, p. 41.)

h. Similarly, § 8.05 of the 2000–1 Servicing Agreement provides:

> The Trustee and any director, officer, employee or agent of the Trustee shall be indemnified by the Seller and held harmless against any loss, liability or the performance of duties hereunder; *provided, however,* that with respect to any such loss, liability or expense, the Trustee shall have given . . . written notice thereof promptly after the Trustee shall have knowledge thereof.

(Pl. Tr. Ex. E, p. 114.)

24. The Servicing Agreements are governed by the laws of the State of New York. (Pl. Tr. Ex. E, p. 128, § 11.04; Pl. Tr. Ex. G, p. 45, § 8.02; Pl. Tr. Ex. H, p. 44, § 8.02.)

25. Following MLN's filing of its bankruptcy petition, on March 7, 2007, Wells Fargo moved for relief from the automatic stay so that it could terminate and replace

MLN as servicer under the Servicing Agreements. The Court granted Wells Fargo's motion on March 20, 2007, and Wells Fargo proceeded according to the Servicing Agreements to terminate MLN as servicer on April 1, 2007 and, through its division, American Servicing Company, assumed servicing duties in the role of successor servicer. (Adv. Doc. # 101, 30:6–9.)

26. This April 1, 2007 termination of MLN as servicer and replacement of Wells Fargo as servicer extinguished MLN's ability to recover the servicing advances it had previously made from the borrowers or from liquidation of the properties under the loans. Instead, as of April 1, 2007, Wells Fargo, as successor servicer, will receive repayments for servicing advances that MLN would have recovered if its role as servicer had continued. (*Id.* at 42:5–11.)

27. Also, the April 1, 2007 termination of MLN as servicer and replacement of Wells Fargo as servicer ended MLN's receipt of servicing fees and other ancillary income MLN had been receiving in its capacity as servicer of the loans. Instead, as of April 1, 2007, Wells Fargo, as successor servicer, will receive the benefit of servicing fees and other ancillary income for its servicing of the loans. (*Id.* at 79:3–81:10, 275:7–15.)

### This Proceeding

28. By this adversary proceeding, MLN asserts two claims: (1) that certain foreclosed properties owned by the trusts but titled in MLN's name as of the time of its bankruptcy petition should be included in the bankruptcy estate, free and clear of any interest of Wells Fargo or the trusts, and (2) that Wells Fargo failed to reimburse MLN for the servicing advances MLN made with respect to the trusts. (Adv. Doc. # 1.)

29. Wells Fargo asserts a counterclaim on behalf of the trusts, asking for a declaration that MLN was incorrect about the titles to the foreclosed properties constituting part of the bankruptcy estate, and for a judgment against MLN for certain expenses that the trusts incurred in connection with the parties' relationship and for certain damages that resulted from MLN's breaches of its contracts with the trusts. Wells Fargo also asserts that any amounts that MLN owes the trusts should be offset against or recouped from any amounts that the trusts owe to MLN. (Adv. Doc. # 9.)

30. In a summary judgment ruling issued on December 11, 2007, the Court rejected MLN's claim that the foreclosed properties were property of the estate and held that the entire equitable interest to the properties belong to Wells Fargo, on behalf of the trusts. *In re Mortgage Lenders Network USA, Inc.*, 380 B.R. 131 (Bankr.D.Del.2007).

31. MLN subsequently amended its claims to drop the claims regarding title to the foreclosed properties, to clarify that it was suing Wells Fargo only in its capacity as indenture trustee or trustee of the trusts, and to add a claim that Wells Fargo would be unjustly enriched if it failed to reimburse MLN for the servicing advances that MLN made with respect to the trusts. (Adv. Doc. # 76.)

32. Thus, the only claims remaining for resolution are MLN claims (breach of contract and unjust enrichment) for recovery of its servicing advances and Wells Fargo's claim for recovery of transfer expenses and damages on behalf of the trusts.

### MLN's Claim To Recover Servicing Advances

#### A. Amount of Recoverable Servicing Advances

32. Pursuant to the terms of the Servicing Agreements, MLN claims to have

advanced $2,274,266 in servicing advances consisting of the following: escrow advances in the amount of $613,982, corporate advances in the amount of $503,898, P & I advances in the amount of $911,512, and deferred interest in the amount of $244,874. (Def. Tr. Ex. 1.)

34. MLN has not received any of this $2,274,266 from borrowers of the loans. (Adv. Doc. # 101, 41:8–10.)

35. MLN and Wells Fargo agree that MLN is entitled to recover a total of $1,770,368 on account of MLN's escrow advances, P & I advances, and deferred interest advances. (*Id.* at 92:16–93:1.)

36. The only remaining dispute between MLN and Wells Fargo as to the amount of recoverable servicing advances is the amount that MLN is entitled to recover for its corporate advances.

37. MLN used the Fidelity (now called Lender Processing Services) software system—a loan-level software tracking system—to track its servicing business. MLN also used the system to compute the dollar amount of the corporate advances that it made under the loans. (*Id.* at 48:24–49:2.)

a. Using an automated process, Fidelity electronically tracks every transaction that occurs on a loan, including payments coming in and disbursements going out. Much, but not all, of the data is instantaneously captured as soon as a transaction occurs without the need for manual intervention. (*Id.* at 23:6–24:18.)

b. The Fidelity system software generates "trial balance" reports which indicate the amount of escrow advances and corporate advances that were part of the servicing advances. (*Id.* at 42:15–43:5, 48:25–49:2.) A "trial balance" report is a snapshot report that the Fidelity system software produces at a certain date and time. (*Id.* at 49:3–15.)

c. MLN provided the trial balance reports for the escrow advances and corporate advances to Wells Fargo at the time of the transfer of servicing. (Adv. Doc. # 101, 34:11–35:9, 43:3–5; Pl. Tr. Ex. L and M.)

d. Wells Fargo never asked for invoice documentation as to the trial balance report for the amount of escrow advances, did nothing to indicate to MLN that it thought the report's trial balance as to the escrow advances was inaccurate, and does not dispute the amount of escrow advances as calculated by the trial balance report. (Adv. Doc. # 101, 41:22–42:1, 43:13–15.)

e. The Fidelity system software also generates a "Five LM" report indicating the amount of P & I advances that are part of the servicing advances, which MLN provided to Wells Fargo at the time of the transfer of servicing. (*Id.* at 44:15–45:7.)

f. Similarly, Wells Fargo never asked for documentation as to the "Five LM" report, did nothing to indicate to MLN that it thought the report generated by the Fidelity software system was inaccurate, and does not dispute the amount of the P & I advances. (*Id.*)

g. A month prior to the transfer of servicing of the loans at issue, MLN transferred 53,000 Residential Funding Company ("RFC") loans to Wells Fargo. (*Id.* at 36:2–6.) In connection with that transaction, MLN provided Wells Fargo trial balance reports generated by the Fidelity software system. (*Id.* at 55:17–57:1.)

h. As to the 53,000 RFC loans, Wells Fargo never asked for invoice documentation as to the trial balance reports generated by the Fidelity system software and did nothing to indicate to MLN that it thought the generated reports were inaccurate. (*Id.*) Rather, Wells Fargo reimbursed MLN for those servicing advances without dispute pursuant to the applicable transfer

agreements. (Adv. Doc. # 101, 28:14–19, 36:7–14.)

I. The transfer of the servicing of the RFC loans from MLN to Wells Fargo was governed by similar, but potentially not identical, transfer agreements as the agreements that governed the transfer of servicing of the loans at issue. (*Id.* at 35:11–36:6, 105:21–106:12.) As the transfer agreements governing the transfer of the servicing of the RFC loans were not admitted into evidence, it is not known exactly if and how the agreements differ.

38. The Fidelity software system is one of the main, but not the only, software system used in the loan servicing industry. It is used by many of the industry's larger loan servicers, including Wells Fargo. (*Id.* at 22:10–23:5.)

39. The Fidelity system software trial balance reports as to the corporate advances that MLN provided to Wells Fargo at the time of the transfer of servicing indicated that of the total $503,898 in corporate advances MLN made, $354,577.51 were made as to the FSA-insured group of loans and $149,320.05 were made as to the MBIA-insured group of loans. (Pl. Tr. Ex. L and M, respectively.)

40. Wells Fargo disputed the validity of the trial balance reports as to the corporate advances made as to both groups of loans and sought production of underlying invoices to substantiate the entire $503,898. (Adv. Doc. # 101, 53:24–54:5.)

41. In response to Wells Fargo's request, MLN provided Wells Fargo with approximately 5,000 invoices, which constituted all of the existing invoices underlying the trial balance reports as to the corporate advances. (*Id.* at 54:6–21.) MLN obtained these invoices from its two vendors, New Invoice and iClean, and also generated ad hoc invoices through its accounts payable department. (*Id.* at 54:6–12.)

42. Though MLN produced all of its invoices, invoices do not exist for all transactions listed on the trial balance reports as to the corporate advances. For example, inspection fees for vendors that were of small dollar amounts were charged electronically through the Fidelity software system, and, thus, no invoices for these transactions exist. (*Id.* at 56:13–20, 95:1–4.)

43. Wells Fargo used the invoices produced by MLN to conduct a limited audit of the trial balances as to the corporate advances. This limited audit consisted of taking a sampling of 10 percent of the loans (approximately 100 loans) for which MLN claimed corporate advances were outstanding and matching invoices to the amounts outstanding as to those loans. Based upon this sampling, Wells Fargo concluded that 15 percent of the corporate advances were not supported by invoices. (*Id.* at 292:21–293:8.)

44. Wells Fargo did not provide any evidence to demonstrate that its audit was statistically meaningful or that its audit was representative of the remaining 90 percent of the loans for which the corporate advances were outstanding. (*Id.* at 293:12–294:14.)

45. MLN did not perform an audit, examination, or other study to determine the dollar value of the corporate advances that were or were not supported by underlying invoices. Similarly, MLN did not perform an audit, examination, or other study to determine how many invoices supporting the corporate advances existed or did not exist. (Adv. Doc. # 101, 237:24–238:15, 242:22–243:1.) Rather, MLN relies on the Fidelity software system's trial balance reports to support its claim for the corporate advances. (Pl. Tr. Ex. L and M.)

46. MLN acknowledges that the Fidelity software system's trial balance reports may not be sufficient to establish a particular corporate advance if a borrower or another party was to dispute the particular advance. (Adv. Doc. #101, 98:2–14, 238:16–239:16.)

47. With the exception of the corporate advances in this case, pursuant to the applicable transfer agreements, MLN has recovered all of the corporate advances it has sought in transactions involving successor servicers other than Wells Fargo. (*Id.* at 59–4–7.) The entity reimbursing to MLN its corporate advances in connection with those transfers did not receive invoices to compare with the trial balance reports. (*Id.* at 57:11–18.)

48. Whether Wells Fargo owes MLN a portion or all of the corporate advances amount is addressed in the Conclusions of Law.

49. MLN claims that it is entitled to prejudgment interest on the total amount of servicing advances that the Court finds MLN is owed. (Adv. Doc. #105, p. 11, ¶ 35.) This also is addressed in the Conclusions of Law.

## B. Timing of MLN's Recovery of MLN's Servicing Advances

50. Wells Fargo has not paid MLN any portion of the servicing advances, including the $1,770,368 on account of escrow advances, P & I advances, and deferred interests advances that MLN and Wells Fargo agree that MLN is entitled to recover. (Adv. Doc. #101, 41:11–13.)

51. In connection with MLN's winding down of its servicing business and transfer of close to 120,000 loans, with respect to all but the loans at issue here, MLN recovered its servicing advances at or around the time of transfer. (*Id.* at 27:17–28:19.)

52. The Servicing Agreements provide that MLN, as servicer, was to recover its servicing advances from the proceeds that MLN recovered only from liquidation of the underlying property or other amounts that it was able to recover directly from the borrower. (Pl. Tr. Ex. E, p. 66 and 78, §§ 3.11(ii) and 3.22(d)(ii); Pl. Tr. Ex. G, p. 34, § 4.01(b); Pl. Tr. Ex. H, p. 33, § 4.01(b).)

53. If MLN had remained the servicer, it would have recovered the servicing advances pursuant to these provisions.

54. The 1999–1 and 1999–2 Servicing Agreements contain no special provision for the recovery of servicing advances in circumstances in which MLN is terminated as servicer.

55. The 2000–1 Servicing Agreement provides that if MLN is terminated as servicer, MLN is entitled to receive "a cash payment equal to the amounts accrued or owing to it under this Agreement on or prior to the date of such termination." (Pl. Tr. Ex. E, p. 106, § 7.01(a).)

56. Besides the fact that, in connection with the winding down of its servicing business, MLN has recovered its outstanding servicing advances with respect to 119,000 of its loans at or around the time of the transfer of servicing, MLN presented no additional evidence to demonstrate that there is a "normal practice" or "industry standard" with respect to the recovery of servicing advances by an outgoing servicer who is going out of business, as is the case here. (Adv. Doc. #101, 102:10–103:20, 107:7–11.)

57. Similarly, Wells Fargo presented no evidence to demonstrate that there is a "normal practice" or "industry standard" with respect to the recovery of servicing advances by an outgoing servicer who is going out of business.

58. Wells Fargo contends that MLN is entitled to recover its servicing advances as to the 2000–1 Trust immediately pursuant to the 2000–1 Servicing Agreement, but that MLN only is entitled to recover its servicing advances as to the 1999–1 and 1999–2 Trusts pursuant to the provisions of the 1999–1 and 1999–2 Servicing Agreements that would have governed MLN's recovery of servicing advances if it had remained servicer—that is, only from "collections or recoveries relating to the Mortgage Loans [held by those Trusts] . . . and such other amounts as may be collected . . . by the Mortgagor." (Pl. Tr. Ex. G, p. 34, § 4.01(b); Pl. Tr. Ex. H, p. 33, § 4.01(b); Adv. Doc. # 104, p. 42, ¶ 17.)

59. As noted, both MLN and Wells Fargo agree that the claims MLN asserts against Wells Fargo are against Wells Fargo solely in its capacity as indenture trustee or trustee of the trusts, on behalf of the trusts. (Adv. Doc. # 9 and 76.)

60. Also as noted, Wells Fargo treats all three of the trusts as separate from one another, and, accordingly, accounts separately for the assets and liabilities of each trust. (Adv. Doc. # 101, 245:12–18.) Thus, Wells Fargo asserts that any claim that MLN has against any of the trusts, such as for servicing advances, must be satisfied solely from the assets of that particular trust or through cash flow generated by that particular trust. (Adv. Doc. # 104, pp. 11–12, ¶ 52–53.)

61. There is no evidence in the record as to the amount of servicing advances that MLN made specifically with respect to the 1999–1 Trust, the 1999–2 Trust, or the 2000–1 Trust.

62. Accordingly, the issues remaining as to the servicing advances are: (1) the amount of servicing advances that Wells Fargo owes MLN; (2) the timing of the recovery of that amount; (3) whether MLN is entitled to prejudgment interest on that amount; and (4) whether that amount must be divided among the trusts. These issues are addressed in the Conclusions of Law.

## Wells Fargo's Counterclaim Against MLN For Certain Expenses

63. On behalf of the trusts, Wells Fargo claims that it is entitled to recover $2,042,415.15 from MLN based upon certain provisions of the Servicing Agreements and certain provisions of the Insurance or Insurance and Indemnity Agreements, and that Wells Fargo is entitled to either setoff or recoup this amount against any amounts the trusts owe MLN. (Def. Tr. Ex. 1; Adv. Doc. # 101, 235:22–25.) The issue of whether the applicable agreements provide for recovery of any or all of this amount is addressed in the Conclusions of Law. Similarly, the issue of setoff versus recoupment is addressed in the Conclusions of Law.

64. Def. Tr. Ex. 1 itemizes the expenses that Wells Fargo claims that MLN owes it pursuant to the Servicing Agreements into 16 categories; the total amount in each category is further split among the three trusts. (Adv. Doc. # 101, 173:13–174:9; Def. Tr. Exs. 2–17.)

65. The first category—expenses related to transfer of servicing records in the sum of $58,691.98—is itemized into 12 subcategories, each split evenly among the three trusts. (Def. Tr. Ex. 2.) Of these 12 subcategories, MLN does not challenge three of the subcategories: welcome letters, Fidelity, and travel expenses. (Adv. Doc. # 101, 69:4–76:10.) By not challenging these three subcategories, MLN concedes that it owes Wells Fargo, on behalf of the trusts, $8,412.50, split evenly among the trusts, for the transfer of servicing records.

66. Of the remaining 15 categories, MLN does not challenge four of the categories: title-recording fees, custodial fees paid to U.S. Bank, DTC fees, and lender-placed insurance premiums. (*Id.* at 6:20–7:9.) By not challenging these categories, MLN concedes that it owes Wells Fargo, on behalf of the trusts, $59,156.50 in title-recording fees ($15,746.25 as to the 1999–1 Trust, $20,007 as to the 1999–2 Trust, and $23,403.25 as to the 2000–1 Trust), $1,957.45 in custodial fees ($528.52 as to the 1999–1 Trust, $645.95 as to the 1999–2 Trust, and $782.98 as to the 2000–1 Trust), $870 in DTC fees, split evenly among the trusts, and $68,416.46 in lender-placed insurance premiums, for a total of $130,400.51.

67. There is no evidence in the record regarding the portion of the lender-placed insurance premium amount that is due to each of the three trusts.

68. The facts surrounding the remaining challenged 12 categories and their subcategories are discussed in turn below.

## A. Transfer of Servicing Records

### 1. Bankruptcy Fees

69. Pursuant to the provisions of the Servicing Agreements covering "Transition Expenses," Wells Fargo asserts that MLN owes the trusts $2,484.99, split evenly among the three trusts, in "bankruptcy fees" related to the transfer of servicing records from MLN to Wells Fargo; Wells Fargo claims that this amount relates to a bankruptcy check performed on all of the transferred loans. (Def. Tr. Ex. 2; Adv. Doc. # 101, 178:5–18.)

70. Wells Fargo provided MLN with an invoice titled "Sub–Servicing Agreement Invoice" sent from Wells Fargo Home Mortgage to the trusts that lists "Bankruptcy Fees" of $2,485 and notes "Sent separate attachments with original bill." This constitutes the only invoice Wells Fargo provided MLN and entered into evidence to substantiate the "bankruptcy fees." (Def. Tr. Ex. 26, 38463–64.)

71. As MLN does not consider this to be adequate substantiation of the expense, MLN contends that Wells Fargo is not entitled to recover from MLN any portion of the "bankruptcy fees" pursuant to the provisions of the Servicing Agreements covering "Transition Expenses." (Adv. Doc. # 101, 70:3–10; Pl. Tr. Ex. E, p. 108, § 7.02; Pl. Tr. Ex. G, p. 40, § 6.01; Pl. Tr. Ex. H, p. 39, § 6.01.)

### 2. Imaging Solutions Bill

72. Pursuant to the provisions of the Servicing Agreements covering "Transition Expenses," Wells Fargo asserts that MLN owes the trusts $10,100.01, split evenly among the three trusts, in "imaging solutions" charges related to imaging and reimaging documents during the transfer of servicing records from MLN to Wells Fargo. (Def. Tr. Ex. 2; Adv. Doc. # 101, 178:19–179:7.)

73. Wells Fargo provided MLN with an invoice titled "Sub–Servicing Agreement Invoice" sent from Wells Fargo Home Mortgage to the trusts that lists "Imaging Solutions Bill" of $10,100 and notes "Faxed backup to Linda Stinson." This constitutes the only invoice Wells Fargo provided MLN and entered into evidence to substantiate the "imaging solutions" charge. (Def. Tr. Ex. 26, 38463–64.)

74. As MLN does not consider this to be adequate substantiation of the expense, MLN contends that Wells Fargo is not entitled to recover from MLN any portion of the "imaging solutions" expense pursuant to the provisions of the Servicing Agreements covering "Transition Expenses." (Adv. Doc. # 101, 70:11–71:2; Pl. Tr. Ex. E, p. 108, § 7.02; Pl. Tr. Ex. G, p. 40, § 6.01; Pl. Tr. Ex. H, p. 39, § 6.01.)

### 3. Document Inventory

75. Pursuant to the provisions of the Servicing Agreements covering "Transition Expenses," Wells Fargo asserts that MLN owes the trusts $2,607.50, split evenly among the three trusts, in "document inventory" costs related to the transfer of servicing records from MLN to Wells Fargo. (Def. Tr. Ex. 2; Adv. Doc. # 101, 179:13–21.)

76. Wells Fargo provided MLN with an invoice titled "Sub–Servicing Agreement Invoice" sent from Wells Fargo Home Mortgage to the trusts that lists "Transition Expenses" of $3,911.25 and notes "See attached email." (Def. Tr. Ex. 26, 38455.) The attached email between two Wells Fargo employees lists "Document Inventory @$2.50/loan × 1,043 loans = $2,607.50" and "Labeling and Shelving @$1.25/loan × 1,043 loans = $1,303.75." (*Id.* at 38456.)

77. As MLN does not consider this invoice and accompanying email to be adequate substantiation of the expense, MLN contends that Wells Fargo is not entitled to recover from MLN any portion of the "document inventory" expense pursuant to the provisions of the Servicing Agreements covering "Transition Expenses." (Adv. Doc. # 101, 71:9–21; Pl. Tr. Ex. E, p. 108, § 7.02; Pl. Tr. Ex. G, p. 40, § 6.01; Pl. Tr. Ex. H, p. 39, § 6.01.)

### 4. Labeling and Shelving

78. Pursuant to the provisions of the Servicing Agreements covering "Transition Expenses," Wells Fargo asserts that MLN owes the trusts $1,303.75, split evenly among the three trusts, in "labeling and shelving" expenses related to the transfer of servicing records from MLN to Wells Fargo. (Def. Tr. Ex. 2; Adv. Doc. # 101, 179:13–21.)

79. Wells Fargo provided MLN with the same invoice and email as it provided as to the "document inventory" costs to substantiate the "labeling and shelving" expenses. (Def. Tr. Ex. 26, 38455–56.)

80. MLN contends that this component of the transfer of servicing records is part of Wells Fargo's own procedures within its records department and is not an activity related to the transfer of servicing, and, thus, is not a proper expense pursuant to the provisions of the Servicing Agreements covering "Transition Expenses." (Adv. Doc. # 101, 71:22–72:10; Pl. Tr. Ex. E, p. 108, § 7.02; Pl. Tr. Ex. G, p. 40, § 6.01; Pl. Tr. Ex. H, p. 39, § 6.01.)

### 5. Iron Mountain

81. Pursuant to the provisions of the Servicing Agreements covering "Transition Expenses," Wells Fargo asserts that MLN owes the trusts $9,899.27, split evenly among the three trusts, for expenses Wells Fargo incurred in putting boxes into storage at Iron Mountain in connection with the transfer of servicing records from MLN to Wells Fargo. (Def. Tr. Ex. 2; Adv. Doc. # 101, 180:10–16.)

82. Wells Fargo provided MLN with an invoice titled "Sub–Servicing Agreement Invoice" sent from Wells Fargo Home Mortgage to the trusts that lists "Iron Mountain" expense of $9,899.27 and notes "See attached spreadsheet from Julie Weltha." (Def. Tr. Ex. 26, 38465.) The attached spreadsheet breaks down the "Iron Mountain" expense into three subcategories, but does not appear to be an invoice. (*Id.* at 38467.)

83. As MLN does not consider this invoice and accompanying spreadsheet to be adequate substantiation of the expense, MLN contends that Wells Fargo is not entitled to recover from MLN any portion of the "Iron Mountain" charge pursuant to the provisions of the Servicing Agreements

covering "Transition Expenses." (Adv. Doc. # 101, 72:11–73:1; Pl. Tr. Ex. E, p. 108, § 7.02; Pl. Tr. Ex. G, p. 40, § 6.01; Pl. Tr. Ex. H, p. 39, § 6.01.)

### 6. Securities Expense

84. Pursuant to the provisions of the Servicing Agreements covering "Transition Expenses," Wells Fargo asserts that MLN owes the trusts $21,600, split evenly among the three trusts, in unspecified "securities expenses" incurred in connection with the transfer of servicing records from MLN to Wells Fargo; Wells Fargo claims these expenses include checking of records and dates. (Def. Tr. Ex. 2; Adv. Doc. # 101, 180:17–24.)

85. Wells Fargo provided MLN with an invoice titled "Sub–Servicing Agreement Invoice" sent from Wells Fargo Home Mortgage to the trusts that lists "Securities Expense" of $21,600 and notes "See attached." (Def. Tr. Ex. 26, 28625.) The attached is a 15 page invoice that appears to substantiate one of the other charges on that invoice, but not the "securities expense" amount.

86. As MLN does not consider this invoice to be adequate substantiation of the expense, MLN contends that Wells Fargo is not entitled to recover from MLN any portion of the "securities expense" charge pursuant to the provisions of the Servicing Agreements covering "Transition Expenses." (Adv. Doc. # 101, 73:2–15; Pl. Tr. Ex. E, p. 108, § 7.02; Pl. Tr. Ex. G, p. 40, § 6.01; Pl. Tr. Ex. H, p. 39, § 6.01.)

87. MLN also contests the "securities expense" charge because Wells Fargo's records indicate that it was incurred and billed in November 2007, more than six months after the transfer of servicing was completed. (Def. Tr. Ex. 2.)

### 7. Walker Travel to Iowa

88. Pursuant to the provisions of the Servicing Agreements covering "Transition Expenses," Wells Fargo asserts that MLN owes the trusts $749.40, split evenly among the three trusts, in travel expenses incurred by Elizabeth Walker to travel to Iowa in October 2007 in connection with the transfer of servicing records from MLN to Wells Fargo. (Def. Tr. Ex. 2; Adv. Doc. # 101, 180:25–181:5.)

89. Walker testified that she took the trip in order "to get an understanding of what the litigation was about." (Adv. Doc. # 101, 180:25–181:5.)

90. As this travel expense was not incurred in connection with the transfer of servicing, MLN contends that Wells Fargo is not entitled to recover from MLN any portion of the travel expenses pursuant to the provisions of the Servicing Agreements covering "Transition Expenses." (Adv. Doc. # 101, 73:16–74:8; Pl. Tr. Ex. E, p. 108, § 7.02; Pl. Tr. Ex. G, p. 40, § 6.01; Pl. Tr. Ex. H, p. 39, § 6.01.)

### 8. Additional Travel Expenses

91. Pursuant to the provisions of the Servicing Agreements covering "Transition Expenses," Wells Fargo asserts that MLN owes the trusts $1,109.65, split evenly among the trusts, in additional travel expenses that relate to travel of Wells Fargo's transition team to Minneapolis in connection with the transfer of servicing records from MLN to Wells Fargo. (Def. Tr. Ex. 2; Adv. Doc. # 101, 181:6–8.)

92. Wells Fargo provided MLN with an invoice titled "Sub–Servicing Agreement Invoice" sent from Wells Fargo Home Mortgage to the trusts that lists "Travel Expenses" of $1,109.65 and notes "See Attached PDF." (Def. Tr. Ex. 26, 38420.) No PDF was provided to MLN or entered into evidence.

93. As MLN does not consider this invoice to be adequate substantiation of the expense, MLN contends that Wells Fargo is not entitled to recover from MLN any portion of the additional travel expenses pursuant to the provisions of the Servicing Agreements covering "Transition Expenses." (Adv. Doc. # 101, 74:9–24; Pl. Tr. Ex. E, p. 108, § 7.02; Pl. Tr. Ex. G, p. 40, § 6.01; Pl. Tr. Ex. H, p. 39, § 6.01.)

94. MLN also contests the additional travel expenses because Wells Fargo's records indicate that the expenses were incurred and billed in December 2007, more than six months after the transfer of servicing was completed. (Def. Tr. Ex. 2.)

### 9. Corporate Advance Audit

95. Pursuant to the provisions of the Servicing Agreements covering "Transition Expenses," Wells Fargo asserts that MLN owes the trusts $416, split evenly among the three trusts, for the limited corporate advance audit that Wells Fargo undertook in connection with the Fidelity system software trial balance reports as to the corporate advances. (Def. Tr. Ex. 2; Adv. Doc. # 101, 181:9–25.)

96. Wells Fargo provided MLN an invoice from "ACS" to the trusts that lists "Corporate Advance Audit at $16/hr for 26 hours" and a "Total Invoice Amount" of $416. (Def. Tr. Ex. 26, 122308–09.)

97. MLN does not contest that this invoice is adequate substantiation of the charge; rather, MLN contests the corporate audit expense because it is not related to the transfer of servicing records from MLN to Wells Fargo, and thus not recoverable pursuant to the provisions of the Servicing Agreements covering "Transition Expenses," and because the amount is unreasonable in that it is too low to have led to a valid audit. (Adv. Doc. # 101, 74:25–76:10, 181:9–25; Pl. Tr. Ex. E, p.

108, § 7.02; Pl. Tr. Ex. G, p. 40, § 6.01; Pl. Tr. Ex. H, p. 39, § 6.01.)

98. In sum, MLN contests $50,270.48 of the $58,691.98 in transfer of servicing expenses that Wells Fargo, on behalf of the trusts, seeks from MLN.

### B. Wells Fargo's Legal Fees Directly Related to Transfer of Servicing

99. Wells Fargo asserts that MLN owes the trusts $102,518, split evenly among the three trusts, in legal fees directly related to the transfer of servicing of the loans, pursuant to the provisions of the Servicing Agreements covering "Transition Expenses." (Def. Tr. Ex. 6; Pl. Tr. Ex. E, p. 108, § 7.02; Pl. Tr. Ex. G, p. 40, § 6.01; Pl. Tr. Ex. H, p. 39, § 6.01.)

100. As testified to at trial by Elizabeth Walker, an employee of the Wells Fargo entity that is indenture trustee or trustee of the trusts, these legal fees were paid to two law firms which provided Wells Fargo, on behalf of the trusts, legal services in connection with the transfer of servicing from MLN to Wells Fargo, such as amending and altering documents as necessary, and in connection with Wells Fargo's motion for relief from the automatic stay to terminate MLN as servicer. (*Id.*; Adv. Doc. # 101, 186:10–188:23.)

101. Walker testified that Wells Fargo hired counsel with regard to transfer of servicing because it always did so whenever "an entity informs [it] that servicing is going to move or that they're filing for bankruptcy." (Adv. Doc. # 101, 187:2–11.)

102. Walker testified that she reviewed the law firms' monthly invoices for accuracy. She found the invoices to be accurate and noted that the fees were "actually low" in comparison to her experience in similar transactions. (*Id.* at 189:5–190:7.)

103. MLN did not introduce any evidence to contradict this testimony.

104. MLN's primary witness, Sandra Jarish, testified at trial that Wells Fargo was required to obtain relief from the automatic stay in connection with the transfer of servicing from MLN to Wells Fargo. (*Id.* at 120:15–20.)

105. MLN contests Wells Fargo's assertion that all of these legal fees must be paid by MLN pursuant to the provisions of the Servicing Agreements covering "Transition Expenses." Specifically, MLN contests that it must pay any legal fees incurred after April 1, 2007, the date that the transfer of servicing was completed. (Adv. Doc. # 104, p. 18, ¶ 62.) Accordingly, it does not contest the invoice dated 3/21/07 in the amount of $30,324.58, the invoice dated 4/13/07 in the amount of $31,264.08, and the invoice dated 4/30/07 in the amount of $18,050.71, for a total of $79,640.37 of the $102,518 that Wells Fargo seeks to recover.

106. A review of the remaining invoices, though redacted, reveals work descriptions such as "reviewing notice of filing and agenda for 6–15–07 hearings" (Def. Tr. Ex. 26, 122288) and "reviewing notice of filing and obtaining copies of Debtor's Motion to Set Bar Date" (Def. Tr. Ex. 26, 122530).

### C. Bond Insurers' Legal Fees Directly Related to Transfer of Servicing

107. Wells Fargo asserts that MLN owes the trusts $113,567.25—$65,329.14 as to the 1999–1 Trust, $24,199.06 as to the 1999–2 Trust, and $24,119.06 as to the 2000–1 Trust—for legal fees incurred by the trusts' bond insurers, MBIA and FSA, related to the transfer of servicing. (Def. Tr. Ex. 7; Adv. Doc. # 101, 195:2–201:2.)

108. When MLN informed Wells Fargo that MLN was going to cease servicing the loans, Wells Fargo contacted MBIA and FSA because, as bond insurers, MBIA and FSA hold financial interests in the trusts. Thereby, MBIA and FSA became involved in the decision of who would become the successor servicer. (Adv. Doc. # 101, 195:21–196:6.)

109. To that end, MBIA and FSA each hired separate counsel to advise them with respect to the transfer of servicing from MLN to Wells Fargo and Wells Fargo's motion for relief from the automatic stay. (*Id.* at 196:2–6.)

110. Walker testified that in the ordinary course of business, MBIA and FSA would submit their respective attorneys' invoices to Wells Fargo, on behalf of the trusts, for payment without a detailed statement of their time entries, and Wells Fargo would pay the invoices on behalf of the trusts without any further investigation into the merits or the reasonableness of the fees that MBIA and FSA were claiming. (*Id.* at 199:23–200:20.)

111. MBIA and FSA have submitted invoices. (Def. Tr. Ex. 7.) However, Wells Fargo, on behalf of the trusts, has not paid MBIA's and FSA's legal expenses because to do so would be pointless: payment of the legal fees would reduce the amount of money available to distribute to the trusts' bondholders, which in turn would require MBIA and FSA to pay the same amount of money back to the trusts to make the bondholders whole. (Adv. Doc. # 101, 227:14–21.)

112. MLN offered no evidence to contest the amount of legal fees and offered no alternative calculation as to the amount of legal fees.

113. MBIA and FSA each have filed a proof of claim in MLN's bankruptcy proceeding for the legal expenses incurred in this litigation.

114. Wells Fargo contends that the provisions of the Insurance Agreement governing the 1999–1 Trust and the Insurance and Indemnity Agreements governing the 1999–2 Trust and the 2000–1 Trust which cover costs and expenses incurred by the Insurer (MBIA and FSA), when read in conjunction with the provisions of the Indentures governing the 1999–1 and 1999–2 Trusts and the provision of the 2000–1 Servicing Agreement which cover amounts owing under the applicable Insurance or Insurance and Indemnity Agreements and the provisions of the Servicing Agreements which cover claims of the bond insurers against the indenture trustee or trustee (Wells Fargo), require MLN to reimburse the legal fees to Wells Fargo, on behalf of the trusts. (Def. Tr. Ex. 21, pp. 24–25, § 3.03(c); Def. Tr. Ex. 22, pp. 27–28, § 3.03(b); Def. Tr. Ex. 23, pp. 16–17, § 3.03(b); Def. Tr. Ex. 24, pp. 64–65, § 8.02(c)(iii); Def. Tr. Ex. 25, pp. 64–65, § 8.02(c)(v); Pl. Tr. Ex. E, p. 26 and p. 85, § 4.04(b)(iv); Pl. Tr. Ex. E, p. 114, § 8.05; Pl. Tr. Ex. G, p. 41–42, § 6.04(c); Pl. Tr. Ex. H, p. 41, § 6.04(c).)

115. MLN contests this basis for recovery of the bond insurers' legal fees, arguing, in effect, that Wells Fargo is claiming the expense on behalf of parties, MBIA and FSA, not before this Court.

### D. REO Property Expenses

116. At the time that MLN's servicing duties were transferred to Wells Fargo, there were approximately 30 properties held by the trusts that MLN had foreclosed upon and whose legal title was in MLN's name. (Adv. Doc. # 101, 202:9–203:23.) The parties refer to these properties at the "REO Properties."

117. This Court declared in December 2007 that equitable interest to the REO Properties resided in Wells Fargo, on behalf of the trusts, and that the REO Prop-

erties were not property of the bankruptcy estate under 11 U.S.C. § 541. *In re Mortgage Lenders Network USA, Inc.*, 380 B.R. 131 (Bankr.D.Del.2007).

118. MLN did not transfer legal title to the REO Properties to Wells Fargo until the spring of 2008, with title to most of the REO Properties being transferred to Wells Fargo on April 17, 2008. (Def. Tr. Ex. 8; Adv. Doc. # 101, 205:15–18.)

119. Wells Fargo asserts that MLN owes the trusts $66,705.68 for expenses Wells Fargo, on behalf of the trusts, paid to maintain the properties while the properties remained titled to MLN. (Def. Tr. Ex. 8; Adv. Doc. # 101, 206:1–207:18.)

120. Normally, a servicer would sell foreclosed or REO Properties as soon as possible to avoid the expenses of maintaining the properties (*e.g.* paying taxes and insurance, employing a lawn mower). (Adv. Doc. # 101, 206:25–207:8.)

121. Because Wells Fargo did not have legal title to the properties when it assumed the servicing duties, it believed it could not sell the properties, and it did not attempt to sell the properties until it held legal title. (*Id.* at 206:1–4.) Thus, Wells Fargo, on behalf of the trusts, maintained the properties once servicing was transferred until it received legal title, whereupon Wells Fargo commenced efforts to sell the REO Properties. (*Id.* at 206:9–207:14.)

122. Wells Fargo claims that it would not have incurred the $66,705.68 to maintain the REO properties if MLN had transferred title to the properties on the date servicing was transferred. (*Id.* at 208:6–10.) Accordingly, Wells Fargo contends that the provisions of the Servicing Agreements which cover costs and expenses incurred by the Indenture Trustee or Trustee (Wells Fargo) require MLN to repay this amount to Wells Fargo, on behalf of the trusts. (Pl. Tr. Ex. E, p. 114,

§ 8.05; Pl. Tr. Ex. G, pp. 41–42, §§ 6.04(b) and 6.04(c); Pl. Tr. Ex. H, p. 41, §§ 6.04(b) and 6.04(c).)

123. In the alternate, Wells Fargo contends that the expenses fall within the definition of "Transition Expenses" under the Servicing Agreements. (Adv. Doc. # 101, 70:3–10; Pl. Tr. Ex. E, p. 108, § 7.02; Pl. Tr. Ex. G, p. 40, § 6.01; Pl. Tr. Ex. H, p. 39, § 6.01.)

124. MLN contests both of Wells Fargo's claims and asserts that legal title was not necessary for Wells Fargo to sell the REO Properties. Rather, for example, Wells Fargo could have sold an REO Property by asking MLN to complete a release on an expedited timeframe. (Adv. Doc. # 101, 127:20–128:11.) Thus, MLN contends that the Servicing Agreements do not obligate it to repay these expenses to Wells Fargo, on behalf of the trusts.

125. MLN's primary witness, Jarish, testified that she did not contest the methodology of calculation of Wells Fargo's claim, nor did she contest the resultant calculation. (*Id.* at 128:18–129:5.) Similarly, MLN offered no alternative calculation of the amount.

126. There is no evidence in the record regarding the REO Property expenses that each trust incurred individually.

### E. Expenses Relating to the Cleveland REO Property

127. Wells Fargo asserts that MLN owes the trusts $70,564.96 for expenses it paid as to a particular REO Property, the "Cleveland REO Property," located at 4118 East 127th Street in Cleveland, Ohio. (Def. Tr. Ex. 9; Adv. Doc. # 101, 208:18–22.)

127. The Cleveland REO Property was one of the approximately 30 properties whose legal title was in MLN's name at the time of the transfer of servicing. (Adv. Doc. # 101, 209:12–13.)

128. The Cleveland REO Property was cited for numerous code violations based upon a city inspection dated April 12, 2007, six days after Wells Fargo assumed overall servicing responsibilities from MLN. (Trial Ex. R; Adv. Doc. # 101, 211:18–212:7.)

129. The City of Cleveland served notice of the April 12, 2007 list of citations by mail upon MLN care of Fred J. Millian in Warrensville, Ohio and upon MLN care of Stephen A. Schwager in Louisville, Kentucky. (Trial Ex. R.)

130. MLN, as testified to by William Rehm, a consultant to MLN involved in the wind-down of MLN's business, maintains a practice of forwarding to a successor servicer any notices relating to a property whose servicing had been transferred from MLN. (Adv. Doc. # 101, 155:8–14.)

131. Rehm also testified that the notice sent by the City of Cleveland contained incorrect mailing addresses for MLN. (*Id.* at 156:21–158:9.) Rehm was unable to testify as to whether, despite this deficiency, MLN received the notice. (*Id.* at 161:21–24.)

133. MLN did not forward to Wells Fargo or otherwise inform Wells Fargo of the notice of the code violations. (*Id.* at 209:12–16.)

134. The Cleveland REO Property again was cited for numerous code violations based on a city inspection on November 22, 2007. (Trial Ex. R.)

135. The City of Cleveland served notice of the November 22, 2007 list of citations by mail upon MLN care of several agents at various addresses and upon Mitchell Heffernan, the president of MLN. Similar to the previous notice, Rehm testified that these mailing addresses were incorrect; he was unable to testify as to whether, despite this deficiency, MLN re-

ceived the notice. (Adv. Doc. # 101, 156:21–161:24.)

136. Again, MLN did not forward to Wells Fargo or otherwise inform Wells Fargo of the notice of the code violations. (Id. at 209:12–16.)

137. As no action was taken as to either set of code violations, the City of Cleveland scheduled judicial proceedings to impose fines against MLN and the property itself. (Trial Ex. R.)

138. No party appeared on behalf of MLN at the initial hearing on February 28, 2008. Pursuant to local rules, the failure to appear resulted in a plea of not guilty on MLN's behalf; a trial was scheduled for May 19, 2008. (Trial Ex. R.)

139. Pursuant to the Court's December 2007 decision regarding the REO Properties, MLN transferred legal title to the Cleveland REO Property to Wells Fargo on April 17, 2008. (Def. Tr. Ex. 8.)

140. Once legal title was transferred, Wells Fargo attempted to sell the property; it was then that Wells Fargo first learned of the fines against the Cleveland REO Property. (Adv. Doc. # 101, 209:17–20.)

141. Due to the fines, Wells Fargo was informed that the City of Cleveland would prevent it from selling the Cleveland REO Property and any other property in the City of Cleveland on which Wells Fargo appeared on the title to. (Id. at 209:22–210:25.)

142. To avoid this contingency, Wells Fargo paid $68,949.96 in fines that the City of Cleveland had imposed on the Cleveland REO Property. (Trial Ex. S; Adv. Doc. # 101, 212:25–213:17.)

143. In addition, Wells Fargo retained counsel in Cleveland to represent it in connection with the legal proceedings surrounding the Cleveland REO Property;

Wells Fargo incurred $1,615 in attorneys' fees and other expenses. (Trial Ex. S; Adv. Doc. # 101, 209:17–22.)

144. MLN offered no evidence or alternative calculation to contest these two amounts.

145. There is no evidence in the record identifying the specific trust that holds the Cleveland REO Property, and, thus, which trust incurred the expenses.

146. Before and between the time that the City of Cleveland issued the first set of citations and the time the City of Cleveland issued the second set of citations for the code violations, Wells Fargo hired inspectors who looked at the property. (Adv. Doc. # 101, 281:15–20.) Also, Wells Fargo's witness, Walker, testified that Wells Fargo was servicing the property. (Id. at 280:3–281:20.)

147. Though it hired inspectors, Wells Fargo did nothing to improve the conditions of the Cleveland REO Property. (Id. at 281:15–20.)

148. Despite taking action that evidences servicing of the Cleveland REO Property, Wells Fargo maintains that because the Cleveland REO Properties were legally titled to MLN until April 17, 2008, Wells Fargo technically was not the servicer of the property because it had no agreement with MLN to service the property. (Id. at 212:12–17.) Indeed, Wells Fargo's witness testified that she was uncertain whether Wells Fargo, as successor servicer, had the authority "to do anything." (Id. at 280:5–20.)

149. Wells Fargo contends that the fines were the result of MLN's breach of its obligation under the Servicing Agreements to administer and service the loans with reasonable care and skill. (Pl. Tr. Ex. E, p. 56, § 3.01(b)(I); Pl. Tr. Ex. G, p. 18, § 2.01(a); Pl. Tr. Ex. H, p. 18, § 2.01(a).)

150. Accordingly, Wells Fargo contends that the provisions of the Servicing Agreements which cover costs and expenses incurred by the indenture trustee or trustee (Wells Fargo) require MLN to repay this amount to Wells Fargo, on behalf of the trusts. (Pl. Tr. Ex. E, p. 114, § 8.05; Pl. Tr. Ex. G, p. 41–42, §§ 6.04(b) and 6.04(c); Pl. Tr. Ex. H, p. 41, §§ 6.04(b) and 6.04(c).)

151. In the alternate, Wells Fargo contends that the expenses fall within the definition of "Transition Expenses" under the Servicing Agreements. (Pl. Tr. Ex. E, p. 108, § 7.02; Pl. Tr. Ex. G, p. 40, § 6.01; Pl. Tr. Ex. H, p. 39, § 6.01.)

152. In contrast, MLN argues that Wells Fargo's inaction, as successor servicer, led to the fines, and, accordingly, Wells Fargo is liable for the expenses.

### F. Future Owner–Trustee Fees to Wilmington Trust

153. Wells Fargo asserts that MLN owes the 1999–1 and 1999–2 Trusts $132,000, split evenly between the two trusts, for owner-trustee fees that will be owed to Wilmington Trust during the next 20 years. (Def. Tr. Ex. 11; Adv. Doc. # 101, 214:8–17.)

154. Wilmington Trust is the owner trustee of the 1999–1 Trust and the 1999–2 Trust. (Adv. Doc. # 101, 215:1–9.) Wilmington Trust is entitled to a payment of $5,500 each year for performing its duties as owner trustee. (Id.)

155. While MLN serviced the loans, it paid this amount out of its own funds; MLN was not reimbursed by the trusts or Wells Fargo as indenture trustee. (Id. at 78:17–79:2, 130:16–23.)

156. While MLN serviced the loans, it was earning approximately $35,000 a month in servicing fees and ancillary income as servicer. (Id. at 107:7–10.) As successor servicer, Wells Fargo is earning more than this amount per month in servicing fees and ancillary income. (Id. at 275:4–17.) Specifically, while MLN serviced the loans, it collected servicing fees of 50 basis points of the principal value of the loans as to all of the trusts; as successor servicer, Wells Fargo is earnings 75 basis points of the principal value of the loans in servicing fees as to the 1999–1 Trust and 62.5 basis points of the principal value of the loans in servicing fees as to the 1999–2 and 2000–1 Trusts. (Id.; Adv. Doc. # 105, p. 3, ¶ 7.)

157. As of April 1, 2007, when servicing was transferred, MLN stopped paying the owner-trustee fees to Wilmington Trust. (Adv. Doc. # 101, 79:14–16.) According to Wells Fargo, when MLN stopped paying the fees, the trusts began paying the fees and will be required to pay the fees for the remaining life of the trusts; Wells Fargo calculated these fees to be $132,000 over the remaining life of the trusts. (Id. at 131:14–18, 216:4–18; Def. Tr. Ex. 11.)

158. This calculation does not take into account the present value of money or otherwise discount the payments over the remaining life of the trusts. (Def. Tr. Ex. 11.)

159. MLN offered no evidence to contest the amount of Wells Fargo's claim and offered no alternative calculation of the amount that Wells Fargo claims. (Adv. Doc. # 101, 131:19–23.)

160. As testified to by Jarish, MLN's witness, the servicer of the loans, now Wells Fargo, is responsible for paying the owner-trustee fees; MLN discontinued paying the fees when it no longer was the servicer of the loans. (Id. at 79:14–25.) Accordingly, MLN contends that Wells Fargo is not entitled, on behalf of the trust, to future owner-trustee fees that

Wells Fargo, as successor servicer, will owe Wilmington Trust.

161. In contrast, Wells Fargo asserts that MLN, as servicer, was not responsible for paying the fees, and, therefore, when Wells Fargo became servicer, it did not assume responsibility for paying the fees. Rather, Wells Fargo contends that MLN was obligated to pay the owner-trustee fees in its capacity as "depositor" in the original securitization transaction, an obligation that was not transferred to Wells Fargo when it became the servicer. (*Id.* at 217:1–16.) Thus, when MLN stopped paying the fees, the trusts were forced to bear and will continue to bear the expense. (*Id.*)

162. Wells Fargo contends that the provisions of the Servicing Agreements which cover costs and expenses incurred by the indenture trustee (Wells Fargo) require MLN to pay the owner-trustee fees to Wells Fargo, on behalf of the 1999–1 and 1999–2 Trusts. (Pl. Tr. Ex. G, p. 41–42, §§ 6.04(b) and 6.04(c); Pl. Tr. Ex. H, p. 41, §§ 6.04(b) and 6.04(c).)

163. In the alternate, Wells Fargo contends that the provisions of the Servicing Agreements which cover "Transition Expenses" require MLN to pay the owner-trustee fees to Wells Fargo, on behalf of the 1999–1 and 1999–2 Trusts. (Pl. Tr. Ex. G, p. 40, § 6.01; Pl. Tr. Ex. H, p. 39, § 6.01.)

### G. U.S. Bank's Estimated Future Custodial Fees

164. Wells Fargo asserts that MLN owes the trusts $93,044.01 -$20,773.64 as to the 1999–1 Trust, $27,428.40 as to the 1999–2 Trust, and $44,841.96 as to the 2000–1 Trust-in custodial fees that will be owed to U.S. Bank during the next 20 years. (Def. Tr. Ex. 12; Adv. Doc. # 101, 217:17–21.)

165. U.S. Bank acts as document custodian for the trusts; it holds original notes, mortgages, and other documents relating to the trusts. (Adv. Doc. # 101, 132:4–12, 218:6–13.)

166. While MLN serviced the loans, it paid approximately $400 per month in custodial fees to U.S. Bank out of its own funds; MLN was not reimbursed by trusts or Wells Fargo as indenture trustee or trustee. (*Id.* at 81:24–82:1, 132:14–21.) MLN paid this amount pursuant to an agreement between MLN, as servicer, and U.S. Bank. (*Id.* at 132:14–21.)

167. While MLN serviced the loans, it was earning approximately $35,000 a month in servicing fees and ancillary income as servicer. (*Id.* at 107:7–10.) As successor servicer, Wells Fargo is earning more than this amount per month in servicing fees and ancillary income. (*Id.* at 275:4–17.) Specifically, MLN collected servicing fees of 50 basis points of the principal value of the loans as to all of the trusts; as successor servicer, Wells Fargo is earnings 75 basis points of the principal value of the loans in servicing fees as to the 1999–1 Trust and 62.5 basis points of the principal value of the loans in servicing fees as to the 1999–2 and 2000–1 Trusts. (*Id.*; Adv. Doc. # 105, p. 3, ¶ 7.)

168. As of April 1, 2007, when servicing was transferred, MLN stopped paying the custodial fees to U.S. Bank. (Adv. Doc. # 101, 81:6–8.) According to Wells Fargo, when MLN stopped paying the fees, the trusts began paying the fees and will be required to pay the fees for the remaining life of the trusts; Wells Fargo calculated these fees to be $93,044.01, split among the trusts as indicated above, over the remaining life of the trusts. (*Id.* at 219:2–220:25; Def. Tr. Ex. 12.)

169. This calculation does not take into account the present value of money or otherwise discount the payments over the

remaining life of the trusts. (Def. Tr. Ex. 12.)

170. MLN offered no evidence to contest the amount of Wells Fargo's claim and offered no alternative calculation of the amount that Wells Fargo claims. (Adv. Doc. # 101, 133:3–23.)

171. As testified by Jarish, MLN's witness, the servicer of the loans, now Wells Fargo, as the party benefitting from the services of the document custodian, is responsible for paying the custodial fees; MLN discontinued paying the fees when it was no longer the servicer of the loans, and, thereby, no longer benefitting from the services of the document custodian. (*Id.* at 82:2–83:13.) Accordingly, MLN contends that Wells Fargo is not entitled, on behalf of the trusts, to future custodial fees that Wells Fargo, as servicer, will owe U.S. Bank or any other entity it employs as document custodian.

172. In contrast, Wells Fargo asserts that the servicer is not required to pay the custodial fees; thus, when MLN stopped paying the fees, the trusts were forced to bear and will continue to bear the expense. (*Id.* at 219:2–220:1.)

173. Wells Fargo contends that the provisions of the Servicing Agreements which cover costs and expenses incurred by the indenture trustee or trustee (Wells Fargo) require MLN to pay the custodial fees to Wells Fargo, on behalf of the trusts. (Pl. Tr. Ex. E, p. 114, § 8.05; Pl. Tr. Ex. G, p. 41–42, §§ 6.04(b) and 6.04(c); Pl. Tr. Ex. H, p. 41, §§ 6.04(b) and 6.04(c).)

174. Alternatively, Wells Fargo contends that the provisions of the Servicing Agreements which cover "Transition Expenses" require MLN to pay the custodial fees to Wells Fargo, on behalf of the trusts. (Pl. Tr. Ex. E, p. 108, § 7.02; Pl. Tr. Ex. G, p. 40, § 6.01; Pl. Tr. Ex. H, p. 39, § 6.01.)

### H. Indenture Trustee Fees

175. Wells Fargo asserts that MLN owes the 1999–1 Trust $279,00 in future indenture trustee fees that MLN would have paid to Wells Fargo, as indenture trustee of the 1999–1 Trust, if MLN had remained servicer of the loans. (Def. Tr. Ex. 13; Adv. Doc. # 101, 133:24–134:8.)

176. When MLN serviced the loans, MLN paid $1,000 per month in indenture trustee fees to Wells Fargo, in its capacity as indenture trustee of the 1999–1 Trust; MLN paid this amount out of its own funds. (Adv. Doc. # 101, 134:4–12.)

177. As of April 1, 2007, when servicing was transferred, MLN stopped paying the indenture trustee fees. (*Id.* at 132:13–15.) Accordingly, Wells Fargo, as indenture trustee of the 1999–1 Trust, is no longer receiving this indenture trustee fee.

178. If MLN had continued as servicer, Wells Fargo, as indenture trustee, would have received 279 additional monthly payments of $1,000. (*Id.* at 222:13–20; Def. Tr. Ex. 13.)

179. Wells Fargo's calculation does not take into account the present value of money or otherwise discount the payments. (Def. Tr. Ex. 13.)

180. MLN offered no evidence to contest the amount of Wells Fargo's claim in this regard, and offered no alternative calculation as to the amount that Wells Fargo claims.

181. Wells Fargo contends that § 6.01 of the 1999–1 Servicing Agreement, which covers "Transition Expenses," requires MLN to pay the future indenture trustee fees to Wells Fargo, on behalf of the 1999–1 Trust. (Pl. Tr. Ex. G, p. 40.)

182. In contrast, MLN contends that the servicer of the loans, now Wells Fargo, is responsible for paying the indenture

trustee fee as it becomes due. (Adv. Doc. # 101, 80:24–81:10.) Thus, MLN does not owe Wells Fargo, on behalf of the 1999–1 Trust, the future indenture trustee fees.

### I. Wells Fargo's Legal Expenses Incurred In This Litigation

183. Wells Fargo asserts that MLN owes the trusts $372,243.07, split evenly among the three trusts, in legal fees that Wells Fargo, as indenture trustee or trustee, incurred in the litigation of this adversary proceeding. (Def. Tr. Ex. 14; Adv. Doc. # 101, 222:21–223:15.)

184. These legal fees encompass the fees and costs paid to two law firms and other miscellaneous expenses, such as document production fees, travel expenses to attend depositions, and travel expenses to attend mediation. (Adv. Doc. # 101, 223:16–224:16.) All the fees were incurred in connection with litigation of this adversary proceeding. (*Id.* at 224:17–225:7.)

185. Walker, Wells Fargo's witness, testified that she reviewed the fees for reasonableness. (*Id.* at 225:12–21.)

186. MLN offered no evidence to contest the amount of Wells Fargo's claim in this regard, and offered no alternative calculation of the amount of the claim.

187. Wells Fargo contends that the legal fees constitute "Transition Expenses" as defined by the applicable provisions of the Servicing Agreements, and, thus, MLN must reimburse them to Wells Fargo, on behalf of the trusts. (Pl. Tr. Ex. E, p. 108, § 7.02; Pl. Tr. Ex. G, p. 40, § 6.01; Pl. Tr. Ex. H, p. 39, § 6.01.)

188. Alternatively, Wells Fargo contends that the provisions of the Servicing Agreements which cover costs and expenses incurred by the indenture trustee or trustee (Wells Fargo) require MLN to pay the legal fees to Wells Fargo, on behalf of the trusts. (Pl. Tr. Ex. E, p. 114, § 8.05; Pl. Tr. Ex. G, p. 41–42, §§ 6.04(b) and 6.04(c); Pl. Tr. Ex. H, p. 41, §§ 6.04(b) and 6.04(c).)

189. MLN asserts that the legal fees are not covered by any provisions of the Servicing Agreements.

### J. Bond Insurers' Legal Expenses Incurred In This Litigation

190. Wells Fargo asserts that MLN owes the trusts $218,272.05—$124,952.28 as to the 1999–1 Trust, $46,659.89 as to the 1999–2 Trust, and $46,659.89 as to the 2000–1 Trust -in legal expenses that the bond insurers, MBIA and FSA, incurred in the litigation of this adversary proceeding. (Def. Tr. Ex. 15; Adv. Doc. # 101, 225:22–226:12.)

191. Walker, Wells Fargo's witness, testified that Wells Fargo, as indenture trustee or trustee, considers the legal expenses to be valid claims against the trusts and does not have any basis to contest the amount that MBIA and FSA submitted to the trusts for payment. (Adv. Doc. # 101, 226:13–228:8.)

192. MLN offered no evidence to contest the amount of Wells Fargo's claim in this regard, and offered no alternative calculation of the amount of the claim.

193. Wells Fargo, on behalf of the trusts, has not paid MBIA's and FSA's legal expenses because to do so would be pointless: payment of the legal fees would reduce the amount of money available to distribute to the trusts' bondholders, which in turn would require MBIA and FSA to pay the same amount of money back to the trusts to make the bondholders whole. (*Id.* at 227:14–21.)

194. MBIA and FSA each have filed a proof of claim in MLN's bankruptcy proceeding for the legal expenses incurred in this litigation.

195. Wells Fargo contends that the provisions of the Insurance Agreement governing the 1999–1 Trust and the Insurance and Indemnity Agreements governing the 1999–2 Trust and the 2000–1 Trust which cover costs and expenses incurred by the Insurer (MBIA and FSA), when read in conjunction with the provisions of the Indentures governing the 1999–1 and 1999–2 Trusts and the provision of the 2000–1 Servicing Agreement which cover amounts owing under the applicable Insurance or Insurance and Indemnity Agreements and the provisions of the Servicing Agreements which cover claims of the bond insurers against the indenture trustee or trustee (Wells Fargo), require MLN to reimburse Wells Fargo, on behalf of the trusts, the legal expenses. (Def. Tr. Ex. 21, pp. 24–25, § 3.03(c); Def. Tr. Ex. 22, pp. 27–28, § 3.03(b); Def. Tr. Ex. 23, pp. 16–17, § 3.03(b); Def. Tr. Ex. 24, pp. 64–65, § 8.02(c)(iii); Def. Tr. Ex. 25, pp. 64–65, § 8.02(c)(v); Pl. Tr. Ex. E, p. 26 and p. 85, § 4.04(b)(iv); Pl. Tr. Ex. E, p. 114, § 8.05; Pl. Tr. Ex. G, p. 41–42, § 6.04(c); Pl. Tr. Ex. H, p. 41, § 6.04(c).)

196. MLN contests this basis for recovery of the bond insurers' legal expenses, arguing, in effect, that Wells Fargo is claiming the expense on behalf of parties, MBIA and FSA, not before this Court.

### K. Undocumented Loan Deferments

197. Wells Fargo asserts that MLN owes the trusts $92,408.94 in potential damages the trusts may incur if borrowers successfully challenge undocumented loan deferments. (Def. Tr. Ex. 16; Adv. Doc. # 101, 228:12–16.)

198. A loan deferment is an agreement that the servicer will allow a delinquent borrower to skip a loan payment(s) and add those skipped payment(s) to the end of the loan, thereby extending the maturity date of the loan. (Adv. Doc. # 101, 83:20–84:4.)

199. While servicer, MLN deferred certain loan payments on certain loans in the trusts. MLN memorialized the loan deferments by entering comments on the Fidelity software system and/or entering written deferment agreements that were placed in the borrower's loan file. Some of the loan deferments were "undocumented," meaning that there was no written agreement to accompany MLN's notation on the Fidelity system software. Based on the testimony of Jarish, MLN's witness, it is unclear whether some of the undocumented loan deferments also were not noted on the Fidelity system software. (*Id.* at 84:5–14.)

200. Jarish testified that even undocumented loan deferments are valid deferments because the loans are still enforceable: if a borrower disputes whether the deferment was made, the servicer can prove the deferment by showing an amortization schedule of the loan payments, which would indicate the missing payment(s), and by examining the Fidelity system software loan-level history on that borrower's loan. (*Id.* at 84:18–87:14.) This is true whether or not the loan deferment was noted on the Fidelity system software.

201. Jarish also testified that if a borrower were to challenge an undocumented loan deferment and insist that the original maturity date of the loan be reinstated, Wells Fargo, as successor servicer, may have to waive the deferred payments because it lacked proof of the deferment. Jarish characterized this risk as "negligible." (*Id.* at 139:6–19.)

202. If Wells Fargo, as indenture trustee or trustee, is required to defend the deferred payments, such as in court, the trusts will be forced to bear the costs of

that defense and any uncollectible deferred payments pursuant to a court ruling that there was no such loan deferment. (*Id.* at 231:17–22.)

203. Since Wells Fargo became the servicer of the loans, some borrowers on the loans held by the trusts have challenged certain undocumented loan deferments. Specifically, out of the 14 loans with undocumented deferred payments that have matured since Wells Fargo became the servicer, eight borrowers have challenged the deferments. (Def. Tr. Ex. 16; Adv. Doc. # 101, 229:23–230:20.)

204. In each of these eight cases, Wells Fargo waived the deferred payments; Walker, Wells Fargo's witness, testified that Wells Fargo did so because it was unable to prove that a deferment agreement existed. (Adv. Doc. # 101, 229:23–230:20.)

205. The deferred payments that Wells Fargo waived totaled $7,361.39. (Def. Tr. Ex. 16.) If Wells Fargo waived the deferred payments on all the outstanding loans with undocumented deferments, Wells Fargo would waive an additional $85,047.55. (*Id.*) This amount, plus the amount Wells Fargo already waived, is the amount Wells Fargo asserts that MLN owes the trusts. (*Id.*)

206. MLN offered no evidence to contest the amount of Wells Fargo's claim in this regard, and offered no alternative calculation of the amount.

207. There is no evidence in the record regarding the amount of undocumented loan deferments attributable to each of the trusts.

208. Wells Fargo contends that the expenses the trusts incurred and potentially will incur due to MLN's undocumented waiver of deferred payments constitute a breach of MLN's obligations under the Servicing Agreements to administer and service the loans with reasonable care and skill. (Pl. Tr. Ex. E, p. 56, § 3.01(b)(I); Pl. Tr. Ex. G, p. 18, § 2.01(a); Pl. Tr. Ex. H, p. 18, § 2.01(a).)

209. Accordingly, Wells Fargo contends that the provisions of the Servicing Agreements which cover costs and expenses incurred by the indenture trustee or trustee (Wells Fargo) require MLN to pay the already incurred and potential expenses due to the undocumented loan deferments to Wells Fargo, on behalf of the trusts. (Pl. Tr. Ex. E, p. 114, § 8.05; Pl. Tr. Ex. G, p. 41–42, §§ 6.04(b) and 6.04(c); Pl. Tr. Ex. H, p. 41, §§ 6.04(b) and 6.04(c).)

210. Separately, Wells Fargo contends that the potential expenses due to the undocumented loan deferments constitute "Transition Expenses" as defined by the applicable provisions of the Servicing Agreements, and, thus, MLN must pay them to Wells Fargo, on behalf of the trusts. (Pl. Tr. Ex. E, p. 108, § 7.02; Pl. Tr. Ex. G, p. 40, § 6.01; Pl. Tr. Ex. H, p. 39, § 6.01.)

211. MLN contests both of these bases for recovery and argues that the issue is premature and speculative.

### L. Principal Balance of Loans With Missing Documentation

212. Wells Fargo asserts that MLN owes the trusts $321,998.80—$27,194.05 as to the 1999–1 Trust and $285,804.75 as to the 2000–1 Trust—for potential damages the trust may incur on the principal balance of loans that are missing documentation, such as assignments. (Def. Tr. Ex. 17; Adv. Doc. # 101, 232:5–24.)

213. When servicing was transferred to Wells Fargo, U.S. Bank, a document custodian with respect to the loans held by the trusts, examined the loan files; it found that 10 of the loan files were missing necessary documentation. (Adv. Doc. # 101,

232:5–24.) U.S. Bank created an "exception report" that briefly described the documentary deficiency with respect to each of these ten loans. (*Id.; *Def. Tr. Ex. 17.)

214. Walker, Wells Fargo's witness, testified that certain document deficiencies may result in a challenge to the trusts' ownership rights in the loan or the underlying property. (*Id.* at 232:20–234:1.) If a challenge is successful, the trusts will be forced to forego repayment of the loan balances. (*Id.* at 234:2–4.)

215. Walker also testified that she does not know if any of the loans will be challenged. (*Id.* at 233:20–234:1.) Wells Fargo did not conduct a risk assessment to determine whether any of the 10 loans have any risk of uncollectibility. (*Id.* at 253:6–15.)

216. Though missing documentation, as testified by Jarish, MLN's witness, each of the 10 loans have a note and title insurance. (*Id.* at 88:4–89:13.)

217. The aggregate of the balances of the loans with documentation deficiencies is $321,998.80. (Def. Tr. Ex. 17.)

218. MLN offered no evidence to contest the amount of Wells Fargo's claim in this regard, and offered no alternative calculation as to the amount.

219. It was MLN's responsibility to ensure that the loan file for a particular loan contained all necessary documents. (Adv. Doc. # 101, 234:24–235:2.)

220. Wells Fargo contends that the expenses the trusts potentially will incur due to the missing documentation constitute a breach of MLN's obligations under the Servicing Agreements to administer and service the loans with reasonable care and skill. (Pl. Tr. Ex. E, p. 56, § 3.01(b)(I); Pl. Tr. Ex. G, p. 18, § 2.01(a); Pl. Tr. Ex. H, p. 18, § 2.01(a).)

221. Accordingly, Wells Fargo contends that the provisions of the Servicing Agreements which cover costs and expenses incurred by the indenture trustee or trustee (Wells Fargo) require MLN to pay the potential expenses due to the missing documentation to Wells Fargo, on behalf of the trusts. (Pl. Tr. Ex. E, p. 114, § 8.05; Pl. Tr. Ex. G, p. 41–42, §§ 6.04(b) and 6.04(c); Pl. Tr. Ex. H, p. 41, §§ 6.04(b) and 6.04(c).)

222. In contrast, MLN argues that none of the potential expenses are recoverable because they are unproven and speculative.

## CONCLUSIONS OF LAW

### *Jurisdiction*

1. The Court has jurisdiction over this core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) & (E).

### *Applicable Law As To Interpretation Of The Agreements*

2. New York law governs all of the pertinent agreements. (Pl. Tr. Ex. E, p. 128, § 11.04; Pl. Tr. Ex. G, p. 45; § 8.02; Pl. Tr. Ex. H, p. 44, § 8.02; Def. Tr. Ex. 21, p. 36, § 6.04; Def. Tr. Ex. 22, p. 41, § 6.05; Def. Tr. Ex. 23, p. 29, § 6.05; Def. Tr. Ex. 24, p. 83, § 11.13; Def. Tr. Ex. 25, p. 83, § 11.13.)

3. Pursuant to New York case law, an agreement must be interpreted and enforced according to the plain meaning of its unambiguous terms: "In New York, it is well-settled that a 'written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms.'" *RMM Records & Video Corp. v. Universal Music & Video Distrib., Corp.,* 372 B.R. 619, 622 (Bankr.S.D.N.Y.2007) (quoting *Greenfield v. Philles Records, Inc.,* 98 N.Y.2d 562, 569, 750 N.Y.S.2d 565, 780 N.E.2d 166 (N.Y.2002)). Similarly, the

plain meaning of words and phrases should be read to "give force and effect to all of [a contract's] provisions." *Trump–Equitable Fifth Ave. Co. v. H.R.H. Constr. Corp.*, 106 A.D.2d 242, 244, 485 N.Y.S.2d 65 (N.Y.App.Div.1985); see also *Petracca v. Petracca*, 302 A.D.2d 576, 577, 756 N.Y.S.2d 587 (N.Y.App.Div.2003) ("A contract should not be interpreted in such a way as to leave one of its provisions substantially without force or effect."). If a contract is clear and unambiguous, a court may not look "outside the four corners of the document." *Vision Dev. Group, LLC v. Chelsey Funding, LLC*, 43 A.D.3d 373, 374, 841 N.Y.S.2d 272 (N.Y.App.Div.2007) (citing *W.W.W. Assoc. v. Giancontieri*, 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 566 N.E.2d 639 (N.Y.1990)).

### MLN's Claim To Recover Servicing Advances

#### A. Amount Of Recoverable Servicing Advances

4. Pursuant to the terms of the Servicing Agreements, MLN claims to have advanced $2,274,266 in servicing advances. Wells Fargo contests MLN's claim that MLN is entitled to recover, from Wells Fargo, on behalf of the trusts, the $503,898 it advanced in corporate advances; Wells Fargo does not contest MLN's claim that is it entitled to recover the remaining $1,770,368 in the other categories of servicing advances.

5. The Court finds that MLN has provided credible documentary evidence and testimony that it made $503,898 in corporate advances. Accordingly, and based on the above facts, the Court finds that MLN is entitled to recover from Wells Fargo, on behalf of the trusts, the entire $503,898 for its corporate advances.

a. One of a loan servicer's obligations is to make servicing advances, including corporate advances.

b. The Fidelity software system is one of the main software systems used in the loan servicing industry to track these servicing advances. Indeed, it is used by Wells Fargo.

c. As to the loans at issue, Wells Fargo accepted reports generated by the Fidelity software system as to escrow advances and P & I advances.

d. As to the 53,000 RFC loans, though governed by a different transfer agreement, Wells Fargo accepted reports generated by the Fidelity system software as to corporate advances.

e. As to other loans that MLN has transferred to loan servicers besides Wells Fargo, those entities reimbursing to MLN its servicing advances accepted reports generated by the Fidelity system software as to corporate advances.

f. Thus, based on industry participants' previous actions and the prevalent use of the Fidelity software system, the Court finds that the trial balance report generated by the Fidelity system software as to the corporate advances is sufficient to establish that MLN made $503,898 in corporate advances.

g. Though Wells Fargo asked for invoices and conducted a limited audit on those invoices to determine that 15 percent of the corporate advances were not supported by documentary evidence, its limited audit was deficient in methodology and scope.

h. I will not rely on this methodologically deficient limited audit, and, accordingly, Wells Fargo has not demonstrated that a reduction of MLN's calculation of its corporate advances based on the Fidelity software system is appropriate.

i. Based on other industry participants' and Wells Fargo's previous acceptance of reports generated by the Fidelity software

system without receiving invoices to compare with those reports, MLN was not required to perform an audit or otherwise substantiate the trial balance computed by the Fidelity software system as to the corporate advances.

j. Similarly, based on other industry participants' and Wells Fargo's previous acceptance of reports generated by the Fidelity software system, the fact that invoices do not exist for every transaction listed on the trial balance reports and the fact that the trial balance report may not be sufficient to establish a particular corporate advance if a party was to dispute that particular advance does not adequately demonstrate that a reduction of MLN's calculation of its corporate advances based on the Fidelity software system is appropriate. Based on industry participants' previous actions, a successor servicer bears the burden of this potentiality upon transfer.

k. Because MLN is no longer the servicer as to the trusts as of April 1, 2007, it has no ability to recover the amounts it advanced. Rather, Wells Fargo, as successor servicer, has assumed the ability to recover these amounts from borrowers through direct payment, from the sale of foreclosed properties, or from the trusts themselves.

l. Thus, the Court finds that Wells Fargo, on behalf of the trusts, owes MLN the $503,898 MLN made in corporate advances and did not recover before its role of servicer was terminated.

6. As Wells Fargo does not dispute that it owes MLN $613,982 in escrow advances, $911,512 in P & I advances, and $244,874 in deferred interest, the Court finds that, as of April 1, 2007, Wells Fargo, on behalf of the trusts, owes MLN $2,274,266 in servicing advances.

### B. Timing of MLN's Recovery of Its Servicing Advances

 7. Wells Fargo does not dispute that MLN is entitled to recover its servicing advances as to the 2000–1 Trust immediately pursuant to § 7.01(a) of the 2000–1 Servicing Agreement. However, Wells Fargo contends that MLN only is entitled to recover its servicing advances as to the 1999–1 and 1999–2 Trusts as it would have had it remained the servicer of the loans— that is, as Wells Fargo receives the reimbursed servicing advances from the borrowers under the loans.

8. The Court finds that MLN is entitled to recover all of the servicing advances as of April 1, 2007, the date of transfer of servicing from MLN to Wells Fargo.

a. Though the 1999–1 and 1999–2 Servicing Agreements, drafted within six months of each other, contain no special provision for recovery of servicing advances in circumstances in which MLN is terminated as servicer, the fact that the 2000–1 Servicing Agreement does contain such a provision does not demonstrate that the parties meant the servicing advances to be recoverable only pursuant to other provisions of the 1999–1 and 1999–2 Servicing Agreements, as Wells Fargo contends. Rather, silence as to recovery upon the transfer of servicing in an *earlier* drafted agreement and then inclusion of a provision in this regard in a *later* drafted agreement also could demonstrate that the parties meant to explicitly codify in the later drafted agreement what they had benignly omitted in the earlier agreement in favor of relying on industry practices, for instance. Thus, I do not find the absence of a provision in the 1999–1 and 1999–2 Servicing Agreement that mirrors § 7.01(a) of the 2000–1 Servicing Agreement to be persuasive as to the parties'

intentions as to the timing of the reimbursement of servicing advances.

b. Though little evidence of a "normal practice" or an industry standard was introduced as to the recovery of servicing advances by an outgoing servicer who is going out of business, the course of conduct of other industry participants and Wells Fargo as to the winding down of MLN's servicing business demonstrates that, at least as to MLN, the predominant practice is to require the applicable party to reimburse the outgoing servicer its servicing advances upon transfer of servicing.

c. This practice is logical in terms of a servicer's obligations and rights. A servicer advances its own funds on behalf of the borrowers under the loans it services, and, in return, the servicer receives fees and other income. A portion of these fees and other income undoubtedly goes to compensating the servicer for advancing its own funds until it is reimbursed and for bearing the potentiality of some of those funds not being reimbursed. While it is the servicer, pursuant to the servicing agreement, it can recover its advances from the borrowers' reimbursements paid to it as the current servicer, from its sale of the properties, or from the trusts themselves. If a servicer is replaced by a different servicer, it no longer receives the fees and other income, and it no longer is entitled to recover the servicing advances pursuant to the servicing agreement. Indeed, in the case of the loans at issue here, there is no mechanism to allow a former servicer to recover its past servicing advances directly from the borrowers or the trusts. Rather, the successor servicer reaps the benefits of the fees and other income, and the successor servicer is entitled to recover the servicing advances pursuant to the servicing agreement. Thus, upon assuming the obligations and rights of a servicer, the successor servicer should reimburse the outgoing servicer its unrecovered servicing advances.

d. This practice also is logical in terms of practicality. MLN is winding down its business in the instant Chapter 11 case. By the time some of the servicing advances are reimbursed, MLN will have completely ceased its operations. Maintaining an estate in order to receive a small stream of income from the 1999–1 and 1999–2 Trusts over many years would be costly and inefficient. Indeed, if I do not find that Wells Fargo, on behalf of the trusts, should have reimbursed MLN its servicing advances as of the time of transfer, Wells Fargo, on behalf of the trusts, will be the only entity reimbursing servicing advances to MLN's estate in the future.

e. Thus, the Court finds that Wells Fargo, on behalf of the trusts, should have reimbursed MLN all of its servicing advances as of the date of transfer of servicing.

### C. MLN's Entitlement To Prejudgment Interest

9. MLN asserts that it is entitled to prejudgment interest on the total amount of servicing advances that the Court finds MLN is owed.

10. The availability of prejudgment interest is a substantive, rather than a procedural issue of the law of damages: if the right to recovery arises under federal law, federal law also governs the availability of prejudgment interest; similarly, if the right to recovery arises under state law, state law also governs the availability of prejudgment interest. *See, e.g., Jarvis v. Johnson*, 668 F.2d 740 (3d Cir.1982) (holding that state law governs in a diversity action); *In re H.P. King Co.*, 64 B.R. 487 (Bankr.E.D.N.C.1986) (holding that the Bankruptcy Code governs the award of

prejudgment interest in a preference action). Accordingly, as to the contract dispute at issue here, the question of whether a party is entitled to prejudgment interest is a question of New York state law.

11. Section 5001(a) of New York's civil code provides:

Interest shall be recoverable upon a sum awarded because of a breach of a contract, or because of an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property, except that in an action of an equitable nature, interest and the rate and date from which it shall be computed shall be in the court's discretion.

Section 5001(b) provides: "[i]nterest shall be computed from the earliest ascertainable date the cause of action existed . . . ." Section 5004 states that "[i]nterest shall be at the rate of nine per centum per annum, except where otherwise provided by statute."

■ 12. Thus, pursuant to controlling New York state law, the Court finds that MLN is entitled to prejudgment interest at the rate of nine percent per annum on the total amount of its servicing advances—$2,274,266—as of April 1, 2007, the date of transfer of servicing. Pursuant to Section 5001(c), "[t]he amount of interest shall be computed by the clerk of the court" to the date of the decision.[1]

### D. Division of Servicing Advances Among The Trusts

13. Wells Fargo asserts that any claim that MLN has against any of the trusts for servicing advances must be satisfied solely from the assets of that particular trust or through cash flow generated by that particular trust.

14. The Court finds that the parties should enlarge the record—preferably by stipulation—as to the allocation of the servicing advances and other expenses among the three trusts.

a. MLN and Wells Fargo agree that MLN is suing Wells Fargo only in its capacity as indenture trustee or trustee of the three trusts. In effect, MLN is suing three distinct parties.

b. Each of the three trusts is governed by separate servicing, insurance, and indenture agreements.

c. Wells Fargo treats all three of the trusts as separate from one another, and, accordingly, accounts separately for the assets and liabilities of each trust.

d. In connection with the wind-down of its servicing business, MLN transferred servicing of 120,000 loans to various servicers. Conceivably, those loans also were transferred in lumped batches, such as trusts; and conceivably, one or two of the three trusts transferred to Wells Fargo could have been transferred to a different subsequent servicer. Therefore, it is logical to presume that MLN's records reflect to which trust certain servicing advances should be allocated.

e. Further, MLN offered detailed reports generated by the Fidelity system software in support of its claim for three of the four categories of servicing advances. Jarish, MLN's witness, testified that these trial balances effectively are documentary support for individual servicing advances. (Adv. Doc. # 101, 42:20–43:12.) As to the final category of servicing advances, MLN

---

1. The daily prejudgment rate is calculated as follows: the principal balance of $2,274,266, representing the amount Wells Fargo, on behalf of the trusts, owes MLN for MLN's servicing advances, multiplied by the per annum simple interest rate of .09, divided by 365 days. Accordingly, the amount of prejudgment interest should be $560.78 per day, which totals to $444,696.89 as of the date of the decision.

provided Wells Fargo with an Excel spreadsheet that MLN created internally. (*Id.* at 46:18–47:2.) Thus, MLN should have little difficulty breaking out the servicing advances among the trusts.

f. However, I note that in its counterclaim against MLN, Wells Fargo, on behalf of the trusts, does not allocate certain of its claims among the trusts, including one category of expenses that the parties agree MLN owes Wells Fargo, on behalf of the trusts. If MLN's claims against the trusts must be satisfied from individual trusts, so too must Wells Fargo's claims against MLN, on behalf of the trusts, be allocated among the trusts.

g. Also, Wells Fargo accepted MLN's internally-created spreadsheet as to one category of the servicing advances after objecting to prior iterations; there is no evidence in the record that Wells Fargo, on behalf of the trusts, raised the issue of allocation among the trusts during the time in which it objected to the iterations of the spreadsheet. (*Id.*) Similarly, Wells Fargo, on behalf of the trusts, seemingly accepted the reports generated by the Fidelity system software as to two other categories of servicing advances without raising the issue of allocation among the trusts. Thus, Wells Fargo may not have clearly indicated to MLN that it required the servicing advances to be broken out by trust, and, as time passed, effectively waived this requirement.

h. Taking these observations into account, if MLN does encounter difficulties in breaking out the servicing advances or if Wells Fargo, on behalf of the trusts, encounters difficulties in breaking out its expenses, the Court will reconsider its finding that the servicing advances and other expenses are to be allocated among the three trusts upon additional submission by MLN and Wells Fargo as to this limited issue. Nevertheless, the Court encourages the parties to enlarge the record by stipulation and assumes that neither MLN nor Wells Fargo will encounter prohibitive problems in allocating the servicing advances and other expenses among the three trusts.

15. In connection with the above finding regarding prejudgment interest, the Court finds that once the servicing advances and other expenses are allocated to each individual trust, each trust also owes prejudgment interest at the rate of nine percent per annum on these amounts as of April 1, 2007, the date of transfer of servicing to the date of this decision, to be calculated by the clerk of the court.

## Wells Fargo's Counterclaim Against MLN For Certain Expenses

### A. "Transfer of Servicing Records" Expenses

16. Wells Fargo asserts that all of the contested subcategories of "transfer of servicing records" expenses are "Transition Expenses" as defined in the Servicing Agreements.

17. All three of the Servicing Agreements provide that Wells Fargo, on behalf of the trusts, is entitled to recover:

> All *reasonable* costs and expenses (including attorney's fees) incurred in connection with transferring the Servicer Mortgage Files to a successor Servicer, amending this Agreement to reflect the appointment of a successor as Servicer . . . or otherwise in connection with the assumption by a successor Servicer of the duties of the predecessor Servicer hereunder (such expenses, "Transition Expenses") . . . [from] the predecessor Servicer *upon presentation of reasonable documentation of such costs and expenses* . . . .

(Pl. Tr. Ex. G, p. 40, § 6.01 (emphasis added); Pl. Tr. Ex. H, p. 39, § 6.01; Pl. Tr. Ex. E, p. 108, § 7.02.)

18. MLN contests some of Wells Fargo's claims for "transfer of servicing records" expenses on the basis that Wells Fargo failed to provide reasonable documentation.

19. "Reasonable documentation" is not defined in the Servicing Agreements. There is little case law as to what constitutes "reasonable documentation" under a contract governed by the laws of the state of New York or otherwise. In *Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams.*, 2005 WL 1950116, at *8, 2005 U.S. Dist. LEXIS 16788, at *26 (S.D.N.Y.2005), which involved the calling of convertible bonds, the court for the Southern District of New York, in determining that the trustee who defended the action on behalf of the bondholders was entitled to be reimbursed its expenses pursuant to an indenture, but that the trustee had not yet provided "reasonable documentation," noted:

> The Trustee only appends a conclusory invoice of $25,042 in expenses incurred from extraordinary services as Trustee in connection with the Trustee's "time spent on the administrative and other work...." The invoice is not itemized nor is it clear what "other work" entails. This perfunctory invoice is insufficient even under the low bar of reasonable documentation.

Similarly, in the context of maritime employers paying maintenance to employees who become ill or injured while serving on a ship, courts have ruled that employees must provide medical reports to document their claims. *See, e.g., McWilliams v. Texaco, Inc.*, 781 F.2d 514, 519 (5th Cir.1986) ("Where doubt exists ... a vessel owner may request reasonable documentation from a[n employee] before it commences payment of maintenance that may prove both lengthy and expensive.").

20. Thus, though the threshold as to what constitutes "reasonable documentation" may be low, based on case law, the Court finds that Wells Fargo was required to provide MLN with documentation from the entity charging the trusts the expense and which outlined the basis for the expense. A lack of documentation to this level of "reasonableness" will preclude some recovery by Wells Fargo, on behalf of the trusts.

21. Of the nine subcategories of "transfer of servicing records" expenses MLN contests, MLN challenges seven of the subcategories on the basis that Wells Fargo failed to provide reasonable documentation.

a. As to the subcategory of "bankruptcy fees," Wells Fargo provided MLN with an invoice that merely lists "Bankruptcy Fees" followed by an amount. Though the invoice references an attached separate "original bill," no other invoice was provided to MLN or entered into evidence. This summary invoice without clear itemization or explanation of the "bankruptcy fees" does not constitute "reasonable documentation" pursuant to the applicable provisions of the Servicing Agreements. Accordingly, the Court finds that Wells Fargo, on behalf of the trusts, is not entitled to recover the $2,484.99 in "bankruptcy fees."

b. As to the subcategory of "imaging solutions bill," Wells Fargo provided MLN with an invoice that merely lists "Imaging Solutions Bill" followed by an amount. Though the invoice references a "faxed backup," no other invoice was provided to MLN or entered into evidence. This summary invoice without clear itemization or explanation of the "imaging solutions bill" does not constitute "reasonable documentation" pursuant to the applicable provisions of the Servicing Agreements. Accordingly, the Court finds that Wells

Fargo, on behalf of the trusts, is not entitled to recover the $10,100.01 in "imaging solutions" charges.

■ c. As to the subcategory of "document inventory" costs, Wells Fargo provided MLN with an invoice that lists "Transition Expenses" in an amount greater than the asserted amount of "document inventory" costs and references an attached email. The attached email between two Wells Fargo employees, seemingly from the same division, lists "Document Inventory $2.50/loan × 1,043 loans = $2,607.50." This summary invoice and attached email between two employees about the "document inventory" costs, which lacks a clear explanation of the costs, does not constitute "reasonable documentation" pursuant to the applicable provisions of the Servicing Agreements. Accordingly, the Court finds that Wells Fargo, on behalf of the trusts, is not entitled to recover the $2,607.50 in "documentary inventory" costs.

d. As to the subcategory of "labeling and shelving" expenses, Wells Fargo provided MLN with an invoice that lists "Transition Expenses" in an amount greater than the asserted amount of "labeling and shelving" expenses and references an attached email. The attached email between two Wells Fargo employees, seemingly from the same division, lists "Labeling and Shelving @$1.20/loan × 1,043 loans = $1,303.75." This summary invoice and attached email between two employees about the "labeling and shelving" expenses, which lacks a clear explanation of the expenses, does not constitute "reasonable documentation" pursuant to the applicable provisions of the Servicing Agreements. Accordingly, the Court finds that Wells Fargo, on behalf of the trusts, is not entitled to recover the $1,303.75 in "labeling and shelving" expenses.

■ e. As to the subcategory of "Iron Mountain" expenses, Wells Fargo provided MLN with an invoice sent from the loan servicing division of Wells Fargo to the trusts that lists "Iron Mountain" expense and references an attached spreadsheet. The attached spreadsheet breaks down the "Iron Mountain" expense into three subcategories; the attached spreadsheet does not appear to be an invoice. This summary invoice, which is on the letterhead of and came from the entity charging the trusts the expense, along with the attached spreadsheet itemizing and explaining the expense, though superficially, does rise to the level of "reasonable documentation" pursuant to the applicable provisions of the Servicing Agreements. Accordingly, the Court finds that Wells Fargo, on behalf of the trusts, is entitled to recover the $9,899.27 in "Iron Mountain" expenses, divided evenly among the three trusts. In connection with the finding regarding prejudgment interest, the Court finds that MLN owes each trust prejudgment interest at the rate of nine percent per annum on its portion of the "Iron Mountain" expenses as of April 1, 2007, the date of transfer of servicing, to the date of this decision, to be calculated by the clerk of the court.

■ f. As to the subcategory of "securities expense," Wells Fargo provided MLN with an invoice that lists "Securities Expense" and notes "see attached." The attached is an invoice that does not appear to substantiate the "securities expense" amount. This summary invoice without clear accompanying itemization or explanation of the "securities expense" does not constitute "reasonable documentation" pursuant to the applicable provisions of the Servicing Agreements. Accordingly, the Court finds that Wells Fargo, on behalf of the trusts, is not entitled to recover the $21,600 in "securities expense" charges.

g. As to the subcategory of "additional travel expenses," Wells Fargo provided MLN with an invoice that lists "Travel Expenses" followed by an amount and references an attached PDF. No PDF was provided to MLN or entered into evidence. This summary invoice without clear itemization or explanation of the "additional travel expenses" does not constitute "reasonable documentation" pursuant to the applicable provisions of the Servicing Agreements. Accordingly, the Court finds that Wells Fargo, on behalf of the trusts, is not entitled to recover the $1,109.65 in "additional travel expenses."

22. MLN contests the remaining two subcategories of "transfer of servicing records"—"Walker travel to Iowa" and "corporate advance audit"—on the basis that the expenses are not encompassed within the definition of "Transition Expenses." For ease of analysis, the subcategory "corporate advance audit" will be discussed first.

23. The Court finds that Wells Fargo is not entitled to recover the requested "corporate advance audit" expense pursuant to the provisions of the Servicing Agreements covering "Transition Expenses."

a. Wells Fargo undertook a limited audit of the Fidelity system software trial balance report as to the corporate advances portion of MLN's servicing advances.

b. Wells Fargo did not undertake any audits of the Fidelity system software reports as to the other portions of MLN's servicing advances. Similarly, Wells Fargo did not undertake any audits of the Fidelity system software reports generated as to the 53,000 RFC loans.

c. With the exception of the Wells Fargo's limited audit in this case, no other successor servicer or entity such as Wells

Fargo in its role as indenture trustee or trustee has undertaken a similar audit.

d. Accordingly, of close to 120,000 loans, the servicing of which MLN transferred in connection with the wind-down of its servicing business, an audit was conducted only as to the servicing advances made with respect to the 1,000 loans transferred in this case, and then only with respect to the corporate advances. Indeed, the reports produced by the Fidelity system software are used by industry participants, including Wells Fargo, to track and account for servicing advances, likely making an audit superfluous.

e. Based on the above, the Court finds that the audit expense does not fall under the definition of "Transition Expenses." First, it was not incurred in the *transfer* of the Servicer Mortgage Files from MLN to Wells Fargo. Second, it was not incurred in connection with amending any of the Servicing Agreements. Third, though it may have been incurred in connection with Wells Fargo's assumption of the servicing duties, if that phrase is interpreted broadly, the expense was not *reasonable* under even the broadest definition of reasonable as related to the assumption of servicing duties. No other servicer or entity such as Wells Fargo in its role as indenture trustee or trustee undertook an audit of the Fidelity system software reports in conjunction with a transfer of servicing. And Wells Fargo itself, on behalf of the trusts, only undertook an audit with respect to corporate advances. Moreover, the Fidelity software system is utilized and relied upon by industry participants, including Wells Fargo. Though Wells Fargo may have deemed the audit necessary, the expense of the audit was not reasonable as exemplified by the conduct of other parties and Wells Fargo itself. Thus, the Court finds that Wells Fargo is not enti-

tled to recover the $416 in "corporate advance audit" expense.

■ 24. As to the subcategory of "Walker travel to Iowa," the Court finds that Wells Fargo is not entitled to recover the requested amount pursuant to the provisions of the Servicing Agreements covering "Transition Expenses."

a. Elizabeth Walker, an employee of Wells Fargo, traveled to Iowa in October 2007 in order "to get an understanding of what the litigation was about"; the litigation referred to is this adversary proceeding. (Adv. Doc. # 101, 180:25–181:5.)

b. First, this expense was not incurred in connection with the *transfer* of the Servicer Mortgage files from MLN to Wells Fargo. Litigation over the reimbursement of servicing advances and the allocation of other expenses arising from Wells Fargo's undertaking of servicing does not relate to the actual transfer of files. Second, clearly, it was not incurred in connection with amending any of the Servicing Agreements. Third, it was not incurred in connection with the *assumption* of Wells Fargo, as successor servicer, of the duties of MLN, as predecessor servicer.

c. The Eighth edition of *Black's Law Dictionary* (2004) defines "assumption" as "[t]he act of taking ... for or on oneself." Under even a broad interpretation of assumption, expenses related to litigation over the reimbursement of servicing advances and the allocation of other expenses arising from the Wells Fargo's taking on of servicing do not connect to the actual assumption of servicing. Rather, the claimed expenses are one degree removed from the expenses defined by "Transition Expenses": they are expenses incurred in bringing and defending a plausible argument over the covered expenses. They were not incurred in connection with Wells Fargo's actual assumption of servicing duties. Thus, the Court finds that Wells

Fargo, on behalf of the trusts, is not entitled to recover the $749.40 in travel expenses incurred by Walker to travel to Iowa pursuant to the provisions of the Servicing Agreements covering "Transition Expenses."

### B. Wells Fargo's Legal Expenses

■ 25. Wells Fargo asserts that MLN owes the trusts legal expenses Wells Fargo, on behalf of the trusts, incurred in the transfer of servicing and this litigation.

26. As to the legal expenses Wells Fargo incurred in the transfer of servicing, Wells Fargo asserts that they are encompassed within the definition of "Transition Expenses." MLN agrees that some of the fees—those incurred before the date that the transfer of servicing was completed—are covered by the definition of "Transition Expenses." Thus, it only contests the legal expenses incurred after April 1, 2007.

27. The Court finds that Wells Fargo, on behalf of the trusts, is not entitled to recover the contested legal expenses pursuant to the provisions of the Servicing Agreements covering "Transition Expenses."

a. A review of the invoices submitted in support of the legal fees incurred after the transfer of servicing was completed reveals work descriptions relating to the instant litigation.

b. The legal fees do not fall under the definition of "Transition Expenses." First, for the same reason as stated in conjunction with Walker's travel expenses, they were not incurred in connection with the *transfer* of the Servicer Mortgage files from MLN to Wells Fargo. Second, clearly, they were not incurred in connection with amending any of the Servicing Agreements. Third, they were not incurred in connection with the *assumption* of Wells Fargo, as successor servicer, of the duties

of MLN, as predecessor servicer. As with Walker's travel expenses, the legal fees are one step removed from the expenses contemplated by the definition of "Transition Expenses." Accordingly, the Court finds that Wells Fargo, on behalf of the trusts, is not entitled to recover the contested $22,877.63 in Wells Fargo's legal fees directly related to the transfer of servicing pursuant to the provisions of the Servicing Agreements covering "Transition Expenses."

c. The Court notes that MLN does not contest $79,640.37 in legal fees, and, thus, Wells Fargo, on behalf of the trusts, is entitled to recover that amount. The $79,640.37 is to be split evenly among the three trusts. In connection with the finding regarding prejudgment interest, the Court finds that MLN owes each trust prejudgment interest at the rate of nine percent per annum on its portion of the uncontested legal fees as of April 1, 2007, the date of transfer of servicing, to the date of this decision, to be calculated by the clerk of the court.

28. As to the legal expenses Wells Fargo incurred in this litigation, Wells Fargo relies on two sets of provisions of the Servicing Agreements, both of which it contends separately entitle it to recover the legal expenses on behalf of the trusts: the provisions covering "Transition Expenses," and the provisions which provide, in essence, that the servicer or seller will reimburse or indemnify Wells Fargo, as indenture trustee or trustee, for reasonable expenses.

29. The Court finds that Wells Fargo, on behalf of the trusts, is not entitled to recover the legal expenses Wells Fargo incurred in this litigation pursuant to the provisions of the Servicing Agreements covering "Transition Expenses." For the same reasons as discussed above in connection with the legal fees Wells Fargo claimed were incurred in the transfer of servicing, but, more accurately, related to the instant litigation, these legal expenses do not fall within the definition of "Transition Expenses" under the applicable provision of the Servicing Agreements.

30. In arguing in the alternate that the provisions of the Servicing Agreements which cover costs and expenses incurred by the indenture trustee or trustee obligate MLN to pay to Wells Fargo, on behalf of the trusts, the legal expenses, Wells Fargo identifies two provisions.

a. All of the Servicing Agreements provide that: "The Servicer [or Seller, defined as MLN or a successor servicer] shall pay or reimburse the Indenture Trustee [or Trustee] ... for all reasonable expenses ... made by the Indenture Trustee [or Trustee] in accordance with the provisions of this Agreement ... (including, but not limited to, the reasonable compensation and expenses and disbursement of its counsel ...)." (Pl. Tr. Ex. G, p. 41–42, § 6.04(b); Pl. Tr. Ex. E, p. 114, § 8.05; Pl. Tr. Ex. H, p. 41, § 6.04(b).)

b. All of the Servicing Agreements also provide that: "The Servicer [or Seller, defined as MLN or a successor servicer] agrees to indemnify the Indenture Trustee [or Trustee] ... from, and hold [it] harmless against, any and all losses and liabilities, damages, claims or reasonable expenses (including reasonable attorneys' fees, expenses and disbursements), incurred or in connection with [the performance of the Indenture Trustee's or Trustee's duties under] this Agreement...." (Pl. Tr. Ex. G, p. 41–42, § 6.04(c); Pl. Tr. Ex. E, p. 114, § 8.05; Pl. Tr. Ex. H, p. 41, § 6.04(c).)

31. The Court finds that Wells Fargo, on behalf of the trusts, is not entitled to recover the legal expenses Wells

Fargo incurred in this litigation pursuant to these provisions.

a. The legal expenses all relate to this adversary proceeding, which was commenced on July 31, 2007. On April 1, 2007, nearly four months prior, the transfer of servicing from MLN to Wells Fargo was completed. At that time, Wells Fargo became the Servicer or Seller as defined by the Servicing Agreements. Accordingly, all the legal expenses accrued when Wells Fargo was the servicer pursuant to the Servicing Agreements.

b. The applicable provisions of the Servicing Agreements require the Servicer or Seller to reimburse the indenture trustee or trustee its reasonable expenses. Here, as to these legal expenses, that party is Wells Fargo, as successor servicer. MLN was not the servicer at the time the expenses were incurred, and, as such, Wells Fargo, on behalf of the trusts, is not entitled to recover the legal expenses Wells Fargo, as indenture trustee or trustee, incurred in this litigation.[2]

### C. Bond Insurers' Legal Expenses

32. Wells Fargo asserts that MLN owes the trusts legal expenses the trusts' bond insurers incurred in the transfer of servicing and this litigation.

33. As to both categories of expenses, Wells Fargo identifies three provisions in the applicable agreements, that, when combined, it argues supports its request for the bond insurers' legal expenses.

34. First, the Insurance Agreement governing MBIA's insurance of certain investments in the 1999–1 Trusts and the Insurance and Indemnity Agreement governing FSA's insurance of certain investments in the 1999–2 and 2000–1 Trusts provide that:

> The Servicer [under the applicable Servicing Agreement] and the Seller [MLN and its successors] agree to pay to the Insurer [MBIA or FSA] as follows: any and all charges, fees, costs and expenses that the Insurer may reasonably pay or incur, including, but not limited to, attorneys' and accountants' fees and expenses in connection with ... (ii) the enforcement, defense or preservation of any rights in respect of any of the Transaction Documents, including defending, monitoring or participating in any litigation or proceeding (including any insolvency or bankruptcy proceeding in respect of any Transaction participant or any affiliate thereof) relating to any of the Transaction Documents....

(Def. Tr. Ex. 21, pg. 24–25, § 3.03(c); Def. Tr. Ex. 22, pp. 27–28, § 3.03(b); Def. Tr. Ex. 23, pp. 16–17, § 3.03(b).) Wells Fargo contends these provisions require MLN to pay MBIA and FSA their legal expenses incurred in the transfer of servicing and in this litigation.

35. Second, the Indenture executed by MBIA with the 1999–1 Trust and the similar Indenture executed by FSA with the 1999–2 Trust obligates Wells Fargo, on behalf of the trusts, to reimburse to either

---

2. Though not raised by Wells Fargo, I note that Walker's travel expenses to Iowa and the legal fees Wells Fargo claimed were incurred in the transfer of servicing, but, more accurately, related to the instant litigation, likewise could be argued to be encompassed by the provisions of the Servicing Agreements covering costs and expenses incurred by the indenture trustee or trustee. As with Wells Fargo's other legal expenses, these expenses were incurred after servicing was transferred from MLN to Wells Fargo, and, as such, Wells Fargo, on behalf of the trusts, is not entitled to recover the legal expenses Wells Fargo, as indenture trustee or trustee, incurred in this litigation from MLN based on the provisions of the Servicing Agreements covering costs and expenses incurred by the indenture trustee or trustee.

MBIA or FSA any "amounts due and owing ... under the [1999–1] Insurance Agreement [or 1999–2 Insurance and Indemnity Agreement]." (Def. Tr. Ex. 24, pp. 64–65, § 8.02(c)(I); Def. Tr. Ex. 25, pp. 64–65, § 8.02(c)(v).) Wells Fargo contends that Wells Fargo, on behalf of the 1999–1 and 1999–2 Trusts, likewise is required to pay MBIA and FSA those same legal expenses incurred in the transfer of servicing and in this litigation.

36. Similarly, the 2000–1 Servicing Agreement obligates Wells Fargo, as trustee, to pay FSA any amounts owing under the Insurance and Indemnity Agreement governing the 2000–1 Trust. (Pl. Tr. Ex. E, p. 26 and p. 85, § 4.04(b)(iv).) Wells Fargo contends that Wells Fargo, on behalf of the 2000–1 Trust, likewise is required to reimburse to FSA those same legal expenses incurred in the transfer of servicing and in this litigation.

37. Third, all of the Servicing Agreements provide that: "The Servicer [or Seller, defined as MLN or a successor servicer] agrees to indemnify the Indenture Trustee [or Trustee] ... from, and hold [it] harmless against, any and all losses and liabilities, damages, *claims* ... incurred or in connection with [the performance of the Indenture Trustee's or Trustee's duties under] this Agreement ...." (Pl. Tr. Ex. G, p. 41–42, § 6.04(c)(emphasis added); Pl. Tr. Ex. E, p. 114, § 8.05; Pl. Tr. Ex. H, p. 41, § 6.04(c).) Wells Fargo contends that the amounts Wells Fargo, on behalf of the trusts, is required to reimburse to the bond insurers under the Indentures and 2000–1 Servicing Agreement constitute claims under these provisions such that MLN, as servicer, is required to indemnify Wells Fargo, on behalf of the trusts, for any such reimbursements.

38. For ease of analysis, the legal expenses that the bond insurers incurred in this litigation are discussed first.

39. The Court finds that Wells Fargo, on behalf of the trusts, is not entitled to recover the legal expenses that the bond insurers incurred in this litigation. These legal expenses accrued almost four months after the transfer of servicing was completed. At the time transfer of servicing was completed, Wells Fargo assumed MLN's role as "Servicer" as defined by the Insurance Agreement, Insurance and Indemnity Agreements, and the Servicing Agreements. In addition, at the same time, Wells Fargo became successor to MLN as "Seller" as defined by those agreements. Accordingly, at the time the legal expenses were incurred, MLN was no longer a party to any of the agreements that could provide a basis for recovery, and hence Wells Fargo, on behalf of the trusts, is not entitled to recover the bond insurers' legal expenses incurred in this litigation.

40. In contrast, the legal expenses the bond insurers incurred in connection with the actual transfer of servicing, accrued before the transfer of servicing was completed, and, thus, MLN would be required to pay to MBIA and FSA the legal expenses pursuant to the pertinent provisions of the Insurance Agreement and Insurance and Indemnity Agreements if the expenses fall under those provisions.

a. These provisions cover legal expenses related to monitoring the bond insurers' rights under the agreements and monitoring litigation, including bankruptcy litigation; thus, the legal expenses are encompassed within the provision.

b. These provisions require that the expenses be reasonable; MLN did not contest the amount of the legal expenses

or present any evidence disputing their reasonableness, and, thus, the Court accepts them as reasonable.

c. If MBIA and/or FSA were before the Court seeking reimbursement of these expenses from MLN, there appears to be a basis for ordering MLN to pay to MBIA and/or FSA these expenses.

d. Similarly, based on the same reasoning, Wells Fargo, on behalf of the trusts, would be required to pay to MBIA and FSA the same legal expenses pursuant to the Indentures and the 2000–1 Servicing Agreement.

41. However, MBIA and FSA are not parties to this proceeding. Before the Court can consider whether MLN owes Wells Fargo, on behalf of the trusts, the bond insurers' legal fees—which Wells Fargo will then reimburse to the bond insurers—some basis to directly connect the expenses as being between MLN and Wells Fargo, on behalf of the trusts, must exist.[3] Otherwise, as MLN argues, Wells Fargo lacks standing under Article III of the United States Constitution, which applies to bankruptcy courts, to assert a claim for the expenses, effectively on behalf of the bond insurers, because the trusts themselves have not suffered a redressable injury. *See N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) (finding that Article III applies to bankruptcy courts); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (noting that standing under Article III requires injury

in fact and a likelihood that the alleged injury will be redressed by a decision in the injured party's favor).

42. To directly connect MLN and Wells Fargo, Wells Fargo points to the provisions of the Servicing Agreements that obligate MLN, as Servicer or Seller, to indemnify Wells Fargo, on behalf of the trusts, for *claims* of the bond insurers against the trusts.

43. Based on these provisions, the Court finds that Wells Fargo, on behalf of the trusts, is entitled to recover the bond insurers' legal expenses directly related to the transfer of servicing.

a. MBIA and FSA have incurred the claimed legal expenses, evidenced by the invoices MBIA and FSA submitted to Wells Fargo.

b. Wells Fargo has not reimbursed MBIA and FSA the expenses because to do so would be futile: payment of the legal fees would reduce the amount of money available to distribute to the trusts' bondholders, which in turn would require MBIA and FSA to pay the same amount of money back to the trusts to make the bondholders whole. However, Wells Fargo, on behalf of the trusts is required to reimburse the bond insurers the expenses, as explained above.

c. The Eighth edition of *Black's Law Dictionary* (2004) defines "claim" as: "any right to payment or to an equitable remedy, even if contingent or provisional."

**3.** MLN argues that the fact that MBIA and FSA each filed a proof of claim as to all the legal expenses on its own behalf indicates that the claims belong to the bond insurers, not Wells Fargo. While MLN is correct that the claims belong to the bond insurers, certain provisions of the Servicing Agreements may effectively transfer the claims to Wells Fargo, such that the claims simultaneously belong to

the bond insurers and Wells Fargo. In that case, MLN can either fulfill the bond insurers' claims or Wells Fargo's claims; fulfilling one effectively will cancel the other as all that is necessary is that the bond insurers receive reimbursement. However, the fact that the bond insurers have an unpaid claim against MLN does not necessarily mean that Wells Fargo does not.

d. Based on this definition, it is clear that Wells Fargo's duty to reimburse the bond insurers constitutes a claim against Wells Fargo, in its capacity as indenture trustee or trustee, as contemplated by the provisions of the Servicing Agreements that direct the servicer to indemnify Wells Fargo against claims asserted against it while fulfilling its duties as indenture trustee or trustee. Though Wells Fargo has not paid their legal expenses yet, the submitted invoices constitute the bond insurers' right to payment, and, thus, there exists a valid claim against Wells Fargo.

e. As noted, MLN was servicer under the applicable agreements when the claims accrued, and, thus, was Seller or Servicer as defined by Servicing Agreements. Accordingly, the Court finds that Wells Fargo is entitled to recover the bond insurers' legal expenses directly related to the transfer of servicing: $65,329.14 as to the 1999–1 Trust, $24,119.06 as to the 1999–2 Trust, and $24,119.06 as to the 2000–1 Trust.[4]

f. In connection with the finding regarding prejudgment interest, the Court finds that MLN owes each trust prejudgment interest at the rate of nine percent per annum on the applicable portion of the bond insurers' legal expenses directly related to the transfer of servicing as of April 1, 2007, the date of transfer of servic-

ing, to the date of this decision, to be calculated by the clerk of the court.

## D. REO Property Expenses

44. Wells Fargo asserts that MLN owes the trusts for expenses that Wells Fargo, on behalf of the trusts, paid as to the REO Properties. Wells Fargo breaks down these expenses into two categories: expenses the trusts incurred while the REO Properties remained titled to MLN, and expenses the trusts incurred in connection with the code violations at the Cleveland REO Property.

45. As to the expenses incurred while the REO Properties remained titled to MLN, Wells Fargo relies on two sets of provisions of the Servicing Agreements, both of which it contends separately entitle it to recover the expenses on behalf of the trusts: the provisions which provide, in essence, that the servicer or seller will reimburse or indemnify Wells Fargo, as indenture trustee or trustee for reasonable expenses; and the provisions covering "Transition Expenses."

46. The Court finds that Wells Fargo, on behalf of the trusts, is not entitled to recover the REO Property expenses pursuant to the indemnification provisions. All the expenses Wells Fargo

---

4. MLN asserts that finding in favor of Wells Fargo as to the bond insurers' legal expenses would upset the bankruptcy code's priority scheme. (Adv. Doc. # 105, p. 39, ¶ 148.) I disagree. The bond insurers' legal expenses relate to work done in connection with the transfer of servicing from MLN to Wells Fargo. It was not until after MLN filed its bankruptcy petition that it contemplated effectuating a wind-down of its servicing business; thus, the bond insurers' legal expenses accrued after MLN filed its bankruptcy petition. And therefore, the bond insurers' legal expenses are post-petition administrative claims, which will be paid in full based on MLN's filed disclosure statement, not pre-petition claims. (Doc. # 2412, p. 5 (indicating that the estimated recovery for general unsecured claims is between 1 and 5 percent).) Either MLN will be required to pay the bond insurers the legal expenses pursuant to the Insurance Agreement and Insurance and Indemnity Agreement or MLN will be required to pay Wells Fargo, as indenture trustee or trustee, the bond insurers' legal expenses pursuant to the indemnity provisions of the Servicing Agreements, as I have found is required. Under either scenario, MLN will pay the same amount. My finding does not implicate the bankruptcy code's priority scheme.

asserts MLN owes the trusts were incurred between the date of the transfer of servicing and the date that MLN transferred legal title to the REO Properties pursuant to the Court's finding in December 2007 that equitable title to the properties resides in Wells Fargo. Accordingly, as discussed above in connection with Wells Fargo's legal expenses incurred in this litigation, all the expenses were incurred after Wells Fargo assumed MLN's duties as servicer and seller.[5] Therefore, MLN was no longer a party to the Servicing Agreements that Wells Fargo asserts require it to pay the expenses at the time the expenses were incurred and Wells Fargo, on behalf of the trusts, is not entitled to recover the REO Property expenses.[6]

47. Likewise, the Court finds that Wells Fargo, on behalf of the trusts, is not entitled to recover the REO Property expenses pursuant to the provisions covering "Transition Expenses." First, the expenses were not incurred in the *transfer* of the Servicer Mortgage Files from MLN to Wells Fargo. Second, the expenses were not incurred in connection with amending any of the Servicing Agreements. Third, the expenses were not incurred in the *assumption* by Wells Fargo of the servicing duties. Rather, the expenses were incurred by Wells Fargo in connection with its new role of servicing the properties after the transfer of servicing was completed. The REO property expenses do not constitute "Transition Expenses."

---

5. Though not argued in connection with expenses incurred while the REO Properties remained titled to MLN, Wells Fargo does argue in connection with the expenses incurred as to the Cleveland REO Property that because the Cleveland REO Property was not legally titled to Wells Fargo, as indenture trustee or trustee, at the time transfer of servicing was completed, Wells Fargo was not the servicer of the property until title was transferred. Thereby, Wells Fargo argues that MLN effectively was still the Servicer and Seller as defined by the Servicing Agreements, and thus, required to reimburse and indemnify Wells Fargo, on behalf of the trusts. (Adv. Doc. # 101, 212:12–17.) I do not agree. As I noted in my December 11, 2007 decision regarding MLN's claim that the foreclosed properties were property of the estate, the Servicing Agreements contain numerous provisions stating that the trusts, not the servicer, owned the mortgages. For example, § 8.08 of the 1999–1 Servicing Agreement and the 1999–2 Servicing Agreement provides that the servicer "acknowledge[s] that [Wells Fargo] remains the sole and absolute record holder of the Mortgage Loans and all rights related thereto." (Pl. Tr. Ex. G, p. 46; Pl. Tr. Ex. H, p. 45; *see also* Pl. Tr. Ex. E, pp. 35–36, § 2.03.) The trusts held title to the properties, regardless of whether MLN recognized that they did; when servicing was transferred from MLN to Wells Fargo, Wells Fargo became Servicer and Seller under the Servicing Agreements. The argument that somehow MLN remained servicer as to the REO properties despite actually transferring servicing because it held legal title to the properties is incorrect.

6. Also, it is questionable whether these expenses rise to the level of reasonableness required by the applicable provisions of the Servicing Agreements. As testified to by Wells Fargo's witness, Wells Fargo did not make any attempt to sell the properties while it did not hold legal title. (Adv. Doc. # 101, 206:1–4.) MLN's witness contends that legal title was not necessary to market the properties for sale and that MLN would have worked with Wells Fargo to expedite the transfer of legal title if a sale was imminent. (*Id.* at 127:20–128:11.) In order to reach the low threshold of reasonableness, Wells Fargo may have been required to take some action to find that indeed it could not even effectively market the properties for sale without legal title; that is, it was unreasonable for Wells Fargo simply to wait until MLN transferred title to the properties to begin the sale process, all the while incurring expenses. However, as I have found that MLN was not a party to the Servicing Agreements at the time these expenses were incurred, and thus cannot be liable pursuant to the Servicing Agreements, whether or not the expenses were reasonable is non-dispositive.

48. As to the expenses incurred as to the Cleveland REO Property due to numerous code violations, Wells Fargo relies on two sets of provisions of the Servicing Agreements, each of which it contends separately entitle it to recover the expenses on behalf of the trusts: the provisions which provide, in essence, that the servicer or seller will reimburse or indemnify Wells Fargo, as indenture trustee or trustee for reasonable expenses; and the provisions covering "Transition Expenses."

49. The Court finds that Wells Fargo, on behalf of the trusts, is not entitled to recover the expenses incurred as to the Cleveland REO Property.

a. Based on the date that the City of Cleveland served the first notice of city code violations on MLN, the initial code violations were allowed to happen while MLN was servicer.

b. Based on the date that the City of Cleveland served the second notice of city code violations on MLN, subsequent code violations were allowed to happen while Wells Fargo was servicer.

c. Wells Fargo's witness testified that Wells Fargo, as successor servicer, inspected the property before the City of Cleveland issued the first set of city code violations, and that Wells Fargo, as successor servicer, began servicing the property when the transfer of servicing was completed.

d. It is the servicer's duty under the Servicing Agreements to maintain the properties.

e. Though some of the city code violations that led to the Cleveland REO Property expenses occurred while MLN was servicer, Wells Fargo assumed servicing of the property despite its condition, which, considering the Cleveland city inspectors cited the property only six days after the transfer of servicing was completed, most likely was visible or should have been visible to Wells Fargo upon its inspection prior to the citation. Wells Fargo essentially accepted the property "as is." Further, Wells Fargo, as servicer, did nothing to improve the decrepit condition of the property when it became servicer, as was its duty. Rather, it allowed the property to deteriorate even further. A portion of the claimed expenses accordingly relate to actions that Wells Fargo took (or did not take) while it was the servicer. No evidence was admitted as to what portion of the expenses relate to MLN's actions versus Wells Fargo's actions. Because Wells Fargo assumed servicing of the property with knowledge of the property's condition and took no action to remedy that condition pursuant to its duty as servicer—which likely would have resolved the code violations and saved all or most of the expenses related to the code violations—I will not impute the expenses back to MLN. Ultimately, MLN is not responsible for the expenses incurred as to the Cleveland REO Property due to numerous code violations and Wells Fargo is not entitled to recover the expenses, on behalf of the trusts, pursuant to any of the provisions of the Servicing Agreements.

### E. Future Fees

50. Wells Fargo asserts that MLN owes the trusts for various fees to be incurred in the future that historically MLN, as servicer, paid while it was the servicer: (1) future owner-trustee fees to Wilmington Trust; (2) future custodial fees to U.S. Bank; and (3) future indenture trustee fees to the 1999–1 Trust's indenture trustee.

51. Wells Fargo relies on two sets of provisions of the Servicing Agreements, both of which it contends separately entitle it to recover the expenses on behalf of the trusts: the provisions which provide, in

essence, that the servicer or seller will reimburse or indemnify Wells Fargo, as indenture trustee or trustee for reasonable expenses; and the provisions covering "Transition Expenses."

52. The Court finds that Wells Fargo, on behalf of the trusts, is not entitled to these future fees.

a. While MLN was servicer it paid all three of these fees as part of its duty as servicer. In return, MLN earned servicing fees and ancillary income.

b. When the transfer of servicing was completed, MLN no longer earned servicing fees and ancillary income. Likewise, when it was no longer servicer, MLN discontinued paying all three of these fees.

c. Wells Fargo, as successor servicer, now receives the benefit of the servicing fees and ancillary income. Indeed, Wells Fargo is making more money per month as servicer than MLN made while servicer.

d. Wells Fargo, as successor servicer, is the appropriate party for the trusts to ask to coordinate with Wilmington Trust, U.S. Bank, and the indenture trustee of the 1999–1 Trust to assume the payment obligations. If Wells Fargo, as successor servicer, does not agree to pay the fees, the trusts simply will have to bear the expenses.

e. MLN no longer services the loans at issue. I will not require it to pay amounts for which it will not receive corollary benefits. Accordingly, the Court finds that Wells Fargo is not entitled to recover the

future fees, on behalf of the trusts, pursuant to any of the provisions of the Servicing Agreements.

### F. Loans With Missing Documentation

53. Wells Fargo asserts that MLN owes the trusts for expenses it may incur in the future as to loans with missing documentation. Wells Fargo breaks these expenses into two categories: "undocumented loan deferments" and "principal balance of loans with missing documentation."

54. As noted, bankruptcy courts are subject to the constraints of Article III of the United States Constitution, including that the court be presented with an actual case or controversy, as opposed to a hypothetical question.[7] *See N. Pipeline Constr. Co.*, 458 U.S. at 50, 102 S.Ct. 2858; *Ehrenfeld v. Mahfouz*, 489 F.3d 542, 545–47 (2d Cir.2007). Similarly, in general, New York state courts will not decide controversies that are wholly speculative. *In re David C.*, 69 N.Y.2d 796, 513 N.Y.S.2d 377, 505 N.E.2d 942, 943 (1987) (noting "[t]he fundamental principle that a court's power to declare the law is limited to determining actual controversies in pending cases ..."). Stated differently, and again similar to federal courts, New York state courts will not issue decisions that have no immediate effect and may not resolve any issues in the future because the presented adjudication involves a future event beyond the control of the parties before the court. *Cuomo v. Long*

7. The Court notes that in some instances the adjudication of claims, as the term is defined in the Bankruptcy Code, may not rise above the constitutional requirement of ripeness if the issue as to that claim was brought in non-bankruptcy litigation. Nevertheless, the adjudication of such issues by bankruptcy courts has been upheld. *See, e.g., In re Combustion Equip. Assoc., Inc.*, 838 F.2d 35, 40 (2d Cir.

1988); *see also* Ralph E. Avery, *Article III And Title 11: A Constitutional Collision*, 12 Bank. Dev. J. 397, 425–33 (1996). The instant action is an adversary proceeding raising issues based in contract law and the equitable doctrine of unjust enrichment. Accordingly, this Court is unambiguously constrained in its adjudication of the raised issues by the requirements of Article III.

*Island Lighting Co.,* 71 N.Y.2d 349, 525 N.Y.S.2d 828, 520 N.E.2d 546, 549 (1988). Thus, in order for this Court to decide whether Wells Fargo is entitled to recover certain expenses, those expenses must not be speculative and/or contingent on the actions of parties not before the court.

55. Wells Fargo's claim for "undocumented loan deferments" breaks down into two parts: a claim for $85,047.55 as to undocumented loan deferments that remain outstanding and a claim for $7,361.39 in undocumented loan deferments that Wells Fargo decided to waive.

56. First, as to undocumented loan deferments that remain outstanding, the Court finds that Wells Fargo is not entitled to recover the requested amounts because the issues associated with Wells Fargo's claim for these expenses are speculative and contingent.

a. Wells Fargo asserts that MLN owes the trusts expenses the trusts may incur in the future if borrowers successfully challenge undocumented loan deferments that remain outstanding.

b. The trusts will only incur these expenses if certain borrowers challenge those loan deferments that are undocumented, and then only if Wells Fargo decides to waive the deferred payments, as it has done previously when faced with a challenged undocumented loan deferment, or if Wells Fargo decides to defend against the borrowers' challenges, in court or otherwise, and incurs expenses in doing so.

c. It is unclear whether borrowers with undocumented deferred loans will challenge their loan deferments: of the 14 loans with undocumented deferred payments that have come due to date, borrowers have challenged eight of them. (Adv. Doc. # 101, 229:23–230:20.) Similarly, it is unclear if Wells Fargo would be successful in defending against the borrowers' challenges, whether in court or otherwise.

d. Thus, it is manifest that the expenses Wells Fargo seeks as to undocumented loan deferments that remain outstanding are speculative and wholly contingent on the future actions of parties not before this Court. I will not take it upon myself to adjudicate issues that effectively are not before me and may never arise. Accordingly, the Court finds that Wells Fargo is not entitled to recover its claim for $85,047.55 as to undocumented loan deferments that remain outstanding.

e. As to this ruling, I note that my finding that the claim is speculative and contingent—that is, that the issue is not ripe—does not preclude Wells Fargo from bringing a similar claim once the issue is ripe.

57. Second, as to expenses incurred because Wells Fargo waived deferred payments, the Court finds that Wells Fargo is not entitled to recover the requested amounts.

a. Wells Fargo asserts that MLN owes the trusts expenses the trusts incurred because Wells Fargo, on behalf of the trusts, waived deferred payments on undocumented loan deferments when certain borrowers challenged those deferred payments. Wells Fargo contends that these expenses meet the definition of "Transition Expenses," or, alternatively, constitute a breach of MLN's obligation under the Servicing Agreements to administer and service the loans with reasonable care and skill, and, thereby, are recoverable pursuant to the provisions which provide, in essence, that the servicer or seller will reimburse or indemnify Wells Fargo, as indenture trustee or trustee for reasonable expenses.

b. These expenses do not meet the definition of "Transition Expenses" as defined in the applicable provisions of the Servicing Agreements. The expenses were not incurred in the *transfer* of the Servicer Mortgage Files from MLN to Wells Fargo. They were not incurred in connection with amending any of the Servicing Agreements. Finally, though they may have been incurred in connection with Wells Fargo's assumption of the servicing duties, if that phrase is interpreted very broadly, the expenses were not *reasonable* under even the broadest definition of reasonable as related to the assumption of servicing duties. Based on the testimony of Wells Fargo's witness, Walker, Wells Fargo simply waived the deferred payments on all the outstanding loans with deferments that came due and were challenged by borrowers. Wells Fargo did not defend against the borrowers' challenges, as MLN's witness, Jarish, testified had a substantial likelihood of being successful. As such, the Court finds that the expenses are not reasonable, and, accordingly, Wells Fargo may not claim that MLN owes the trusts the expenses based on the provisions of the Servicing Agreements covering "Transition Expenses."

c. These expenses also do not constitute a breach of MLN's obligation under the Servicing Agreements to administer and service the loans with *reasonable* care and skill. As testified to by MLN's witness, a lack of documentation does not mean the deferred loan is not enforceable. Additionally, an unknown number of, but a portion of, the undocumented loan deferments are noted on the Fidelity software system, which provides at least some documentation. Further, no evidence was admitted as to what percentage of loans with deferments were not documented. However, it seems logical to assume that loans with undocumented deferments represent a small percentage of the total number of loans with deferments, the rest of which ostensibly are documented. Just as reasonable is a low threshold as to documentation, reasonable is a low threshold as to care and skill. MLN's actions in not fully documenting a small portion of loan deferments does not rise to the level of unreasonableness. Accordingly, Wells Fargo may not claim that MLN owes the trusts the expenses based on the provisions of the Servicing Agreements directing the servicer to administer and service the loans with reasonable care and skill.

58. Finally, Wells Fargo claims that MLN owes the trusts for expenses the trust may incur on the principal balance of loans that are missing documentation. The Court finds that Wells Fargo is not entitled to recover the requested amounts because the issues associated with Wells Fargo's claim for these expenses are speculative and contingent

a. As noted by Wells Fargo, the missing documentation could lead to challenges, such as to the trusts' ownership rights in the underlying properties, that might result in the trusts not being repaid the loan balances.

b. In order for the trust to incur the expenses, a third party not currently before this Court, sometime in the future, must challenge the loans based on the missing documentation. As testified by Wells Fargo's witness, it is unclear whether any of the loans will be challenged. (Adv. Doc. # 101, 233:20–234:1.) Further, it is unclear whether such a challenge would be successful. As with the future undocumented loan deferments, these expenses are speculative and wholly contingent on the actions of parties not before the Court.

c. I will not take it upon myself to adjudicate issues that effectively are not before me and may never arise. Accord-

ingly, the Court finds that Wells Fargo is not entitled to recover the requested amount in expenses related to the principal balance of loans with missing documentation.

d. As to this ruling, I note that my finding that the claimed expenses are speculative and contingent—that is, that the issue is not ripe—does not preclude Wells Fargo from bringing a similar claim once the issue is ripe.

### G. Recoupment vs. Setoff

59. Wells Fargo, on behalf of the trusts, seeks to setoff, pursuant to 11 U.S.C. § 553(a), certain of the amount it owes MLN for its servicing advances by amounts that it contends MLN owes Wells Fargo. MLN asserts that Wells Fargo's right to setoff is limited by the doctrine of recoupment.

60. Recoupment is a common law doctrine which "permits a creditor that owes a debt to the debtor to reduce the amount of its debt by the amount of a debt owed by the debtor to the creditor" if the debts arise out of the same transaction.

*Anes v. Dehart*, 195 F.3d 177, 182 (3d Cir.1999); *see also Lee v. Schweiker*, 739 F.2d 870, 875 (3d Cir.1984) ("Recoupment . . . allows the creditor to assert that certain mutual claims extinguish one another in bankruptcy.").

61. The transaction at issue in this adversary proceeding is the transfer of servicing from MLN to Wells Fargo.

a. I have found that MLN owes Wells Fargo, on behalf of the trusts, two categories of expenses related to the transfer of servicing: "Iron Mountain" expenses and the bond insurers' legal fees incurred in the transfer of servicing. In addition, MLN has agreed that it owes Wells Fargo, on behalf of the trusts, for certain other expenses incurred in the transfer of servicing.

b. MLN owes Wells Fargo, on behalf of the trusts, all of these categories of expenses pursuant to provisions of the Servicing Agreements.[8]

c. Wells Fargo owes MLN for servicing advances that MLN made while servi-

---

8. MLN contends that the expenses related to the bond insurers are not subject to recoupment, arguing that the expenses do not arise from the same transaction, and alternatively, pointing to the statement, "[t]he justification for the defensive use of recoupment [by a defendant] in bankruptcy is that there is no independent basis for a 'debt,' and therefore there is no 'claim' against estate property." *Aetna U.S. Healthcare, Inc. v. Madigan (In re Madigan)*, 270 B.R. 749, 754 (9th Cir. BAP 2001); Adv. Doc. # 101, p. 39, ¶¶ 146–47. Though the expenses, as between MLN and the bond insurers, clearly do not arise from the same transaction, I have found that MLN owes Wells Fargo these expenses pursuant to the Servicing Agreements. In addition, the expenses were incurred in the transfer of servicing, just as certain of Wells Fargo's legal fees were incurred in the transfer of servicing, which, I note, MLN has not argued are not reimbursable pursuant to the Servicing Agreements provided the fees were incurred in the

transfer of servicing. As to the above quotation, most importantly, regardless of whether there is an independent basis for the debt, allowing Wells Fargo to recoup these expenses will not upset the Bankruptcy Code's priority scheme: the amount is an administrative claim and as MLN is administratively solvent, the claim will be paid in full regardless of whether MLN pays the bond insurers or Wells Fargo, on behalf of the trusts. In the context of bankruptcy, the use of the equitable doctrine of recoupment should be restricted when its use upsets the recovery percentage of creditors. The court in *In re Madigan* also noted that "[t]he application of recoupment goes to the equity of the claim." *In re Madigan*, 270 B.R. at 754 (quoting *Long Term Disability Plan of Hoffman–La Roche, Inc. v. Hiler*, 99 B.R. 238, 243 (Bankr.D.N.J.1989)). It is equitable and efficient to allow Wells Fargo, on behalf of the trusts, to "net out" this debt owed to it by MLN against the debts it owes to MLN.

cer. These expenses too arise from the transfer of servicing and the Servicing Agreements: Wells Fargo has become the successor servicer under the Servicing Agreements, and, as such, it will reap the benefits of MLN's prior servicing advances; thereby, Wells Fargo, on behalf of the trusts, is obligated to refund to MLN those prior servicing advances in conjunction with the transfer of servicing.

d. Thus, the doctrine of recoupment applies to the debts that Wells Fargo seeks to be extinguished: both debts arise from the same transaction and involve the same agreement.

62. As such, I do not need to take up whether the amounts are subject to setoff under 11 U.S.C. § 553(a).

### CONCLUSION

Accordingly, Wells Fargo, on behalf of the trusts, as of April 1, 2007, owes MLN $2,274,266 in servicing advances. This amount is payable as of April 1, 2007, with prejudgment interest accruing pursuant to New York state civil code § 5001 as of that date to the date of this decision. Further, this amount, including the applicable prejudgment interest, is to be divided among the three trusts by stipulation of the parties. Conversely, MLN owes Wells Fargo, on behalf of the trusts, the amounts it concedes it owes Wells Fargo and the amounts I have found MLN owes Wells Fargo, on behalf of the trusts—"Iron Mountain" expenses and the bond insurers' legal fees incurred in the transfer of servicing. Pursuant to New York state civil code § 5001, these amounts also are subject to prejudgment interest as of April 1, 2007 to the date of this decision. These amounts, including the applicable prejudgment interest, are to be divided among the three trusts as discussed above and as to be agreed upon by stipulation of the parties as to those expenses not currently divided among the trusts. After all the amounts are divided among the trusts and calculated to include prejudgment interest, Wells Fargo, on behalf of each trust, may "net out" the amount MLN owes each trust against the amount each trust owes MLN.

I am not entering an order on this decision at this time. I want to give counsel an opportunity to resolve the allocation of expenses as among the three trusts. If the parties can resolve that issue then I am directing that MLN's counsel submit a proposed order on notice. If the parties cannot resolve that issue, then counsel should contact my courtroom deputy to schedule a status conference so that we can establish a time for a further hearing to resolve the issue.